# Exhibit B

## Page 262

1        (Plaintiff Exhibit 20 received in evidence)
2        MS. TUCKER: May we publish it to the jury?
3        THE COURT: Yes.
4  BY MS. TUCKER:
5  Q. Mr. Palermo, I am going to ask you to take a look at
6  Plaintiff Exhibit 21. Do you recognize this document?
7  A. It appears to be a copy of my 2002 tax return.
8  Q. Federal tax return?
9  A. Yes.
10  Q. Is that your signature on page 3 of the tax return?
11  A. Yes.
12        MS. TUCKER: Your Honor, I offer Plaintiff Exhibit 21
13  in evidence.
14        MR. OBERDIER: Your Honor, I would object unless we
15  have a theory of relevance. I think these go back in time
16  before any transfer as to which Mr. Palermo's financial
17  condition would be relevant.
18        THE COURT: Well, I am going to allow it subject to
19  connection.
20  BY MS. TUCKER:
21  Q. Mr. Palermo, if you look at line 73 of that tax return,
22  does that show that you owed $189,309 in taxes for the 2002 tax
23  year?
24        THE COURT: For what year?
25        MS. TUCKER: 2001, I'm sorry. We are looking at 20.

## Page 263

1  A. I am confused. What year are we looking at?
2  Q. Plaintiff Exhibit 20, tax year 2001.
3        THE COURT: What is your question?
4  Q. Mr. Palermo, how much in taxes did you owe --
5  A. I want to look at it first, please.
6        OK. I have it.
7  Q. How much did you owe to the IRS for your 2001 federal
8  taxes?
9        THE COURT: As of what date?
10  Q. As of the date you signed your tax return?
11  A. 83,000 --
12        THE COURT: When --
13  Q. November 17, 2003?
14  A. Are you sure that's the date?
15        $83,810.
16  Q. Are you looking at Plaintiff Exhibit 20?
17  A. I certainly am. Do you want to come up here and look at
18  it?
19  Q. Mr. Palermo, I direct your attention to line 70 of the tax
20  return.
21        THE COURT: Which one? What exhibit?
22        MS. TUCKER: Plaintiff Exhibit 20, line 70.
23        THE COURT: You are talking about the year 2001?
24        MS. TUCKER: Correct.
25        THE COURT: You are asking how much he owed as of

## Page 264

1  November 17, 2003 on his 2001 taxes?
2        MS. TUCKER: Correct.
3        THE WITNESS: $31,139.
4        Is that the number that you are looking for.
5  BY MS. TUCKER:
6  Q. Is that the money that you owed?
7  A. I am a little confused as to what year and what exhibit.
8  My exhibit for 20 is 2001. That is not what you asked for
9  before.
10  Q. Correct.
11  A. That's what I am looking at now.
12  Q. We are looking at the your tax return for 2001.
13  A. Right.
14  Q. And we are trying to determine how much you owed in taxes
15  as of November 17, 2003 when you signed the tax return.
16  A. $31,139.
17  Q. Did you pay those moneys?
18  A. I am not sure how much of it has been paid.
19  Q. Do you know when you would have paid it?
20  A. No.
21  Q. Did you pay it at the time -- any moneys at the time you
22  filed your tax return?
23  A. I don't recall.
24        MS. TUCKER: Your Honor, I'm sorry. If we may just
25  have two minutes.

## Page 265

1  Q. Mr. Palermo, would you take a look at what's been marked as
2  Plaintiff Exhibit 3 for identification.
3        Mr. Palermo, do you recognize these documents?
4  A. Not specifically, no.
5  Q. Do you recall providing documents to the trustee when you
6  filed your bankruptcy petition?
7  A. Yes.
8  Q. What documents did you provide?
9  A. Everything he asked for.
10  Q. Was one of those requests bank statements?
11  A. Yes.
12  Q. Did he request the bank statements for Beekman Street
13  Advisory Corp?
14  A. Yes, he did.
15  Q. Are these fair and accurate copies of the bank statements
16  for Beekman Street Advisory Corp that you provided to him for
17  statement dated December 31, 2003 through statement date May
18  28, 2004?
19  A. It appears to be, yes.
20        MS. TUCKER: Your Honor, I offer Plaintiff Exhibit 3
21  in evidence.
22        MR. OBERDIER: No objection, your Honor.
23        THE COURT: No objection.
24        3 is admitted in evidence.
25        (Plaintiff Exhibit 3 received in evidence)

10/26/2010  Trial Day 2 - Palermo Korff

```
 1   BY MS. TUCKER:
 2   Q.  Mr. Palermo, I now direct your attention to Plaintiff
 3   Exhibit 4 for identification.  Do you recognize these
 4   documents?
 5   A.  No.
 6   Q.  Do you recall providing financial documents for Beekman
 7   Street Advisory Corp from August 2004 through December 2004 to
 8   the trustee?
 9   A.  No.  But if they asked for it, I provided it but I don't
10   recall specifically -- we gave them 9,000 documents.
11   Q.  When you say "we," who is we?
12   A.  Me.
13   Q.  And to the trustee, you are referring to David Kittay?
14   A.  Yes.
15   Q.  Are these the records that you gave to Mr. Kittay?
16   A.  A portion, probably.
17   Q.  But these are included in the records you gave to
18   Mr. Kittay?
19   A.  I can't be sure.  We gave them 9,000 documents.
20           MS. TUCKER:  Your Honor, I offer Plaintiff Exhibit 4
21   in evidence.
22           MR. OBERDIER:  Objection, your Honor.  Lack of
23   foundation.
24           THE COURT:  Mr. Palermo, do you recognize these as the
25   bank statements of Beekman Street Advisory Corp at Bank of
```

266

10/26/2010  Trial Day 2 - Palermo Korff

```
 1   America?
 2           THE WITNESS:  Yes, your Honor.
 3           THE COURT:  Do they cover the period August 2004 to
 4   December 31, 2004?
 5           THE WITNESS:  I would have to look at them more
 6   carefully, the dates.
 7           What exhibit is that?
 8           THE COURT:  It is Exhibit 4.
 9           THE WITNESS:  Pardon me?
10           THE COURT:  It is Exhibit 4.
11           THE WITNESS:  It says here August 26, '04 to December
12   31, '04.
13           THE COURT:  I will admit Exhibit 4 into evidence.
14           (Plaintiff Exhibit 4 received in evidence)
15   BY MS. TUCKER:
16   Q.  Mr. Palermo, I direct your attention to Plaintiff Exhibit 5
17   for identification.  Do you recognize these documents?
18   A.  Not specifically, but on the face of it, it looks like it
19   is March '05 through October of '05.
20   Q.  What are these documents?
21   A.  Well, there is a myriad of things here.
22           THE COURT:  Are they Beekman bank statements?
23           THE WITNESS:  Yes.  A portion of them are.
24           MS. TUCKER:  Your Honor, I offer Plaintiff Exhibit 5
25   in evidence.
```

267

10/26/2010  Trial Day 2 - Palermo Korff

```
 1           MR. OBERDIER:  No objection, your Honor.
 2           THE COURT:  Plaintiff Exhibit 5 is admitted into
 3   evidence.
 4           (Plaintiff Exhibit 5 received in evidence)
 5   BY MS. TUCKER:
 6   Q.  If I could direct your attention to Plaintiff Exhibit 10
 7   for identification.  Mr. Palermo, do you recognize these
 8   documents?
 9   A.  Not specifically, but they appear to be bank statements
10   from 12/03 to -- just 12/03.
11   Q.  And it is the Fleet Bank statements for Argus Asset
12   Management LLC?
13   A.  Yes.
14           MS. TUCKER:  Your Honor, I offer Plaintiff Exhibit 10
15   in evidence.
16           MR. OBERDIER:  No objection.
17           THE COURT:  10 is admitted into evidence.
18           (Plaintiff Exhibit 10 received in evidence)
19   BY MS. TUCKER:
20   Q.  I direct your attention to what has been marked as
21   Plaintiff Exhibit 11 for identification.  Mr. Palermo, do you
22   recognize these documents as being the Key Bank account
23   statements for Argus Asset Management LLC from June 30, 2004
24   through July 31, 2005?
25           THE COURT:  I am sorry.  We have to go back -- we
```

268

10/26/2010  Trial Day 2 - Palermo Korff

```
 1   don't have to go back.
 2           You are on Exhibit 11?
 3           MS. TUCKER:  Correct.
 4           THE COURT:  Question.
 5           MS. TUCKER:  I believe the question was pending.
 6   A.  Yes.
 7           MS. TUCKER:  Your Honor, I move Plaintiff Exhibit 11
 8   in evidence.
 9           MR. OBERDIER:  Your Honor, we object to any evidence
10   of Mr. Palermo's financial condition after July 2004 which this
11   would constitute, so we object on the grounds of relevance.
12           THE COURT:  What I have looked at starts June 30,
13   2004.
14           MR. OBERDIER:  But I believe it goes through July '05.
15           MS. TUCKER:  Could we have a sidebar?
16           THE COURT:  I am not going to make a ruling on that at
17   this point, but we will talk about it while the jury is at
18   lunch.
19           MR. OBERDIER:  Thank you, your Honor.
20   BY MS. TUCKER:
21   Q.  Mr. Palermo, if I could turn your attention it Plaintiff
22   Exhibit 12.  Do you recognize this to be Argus Asset
23   Management's bank letters from March 29, 2005 through July 29,
24   2005?
25   A.  Yes.
```

269

1   quantum meruit basis: I am entitled to be compensated for all
2   of the advances over the years. I haven't circled the number
3   on it. I am entitled to be compensated for cash advanced to
4   his various entities and to him. And I don't -- and should I
5   elect to get out of the South Boston deal, whatever cash has
6   been advanced in connection with that transaction, my
7   understanding is I don't know what the precise dollar amount is
8   with regard to cash advances that I have received.
9   A.  That's an error. I did not sign off on this transcript.
10  To the best of my recollection, "received" is clearly not what
11  the context of that sentence means. It should have been is
12  with regard to cash advances I have advanced.
13          But go ahead.
14          That's my recollection now, looking at it. But I'm
15  certainly not saying this is my recollection of the '06
16  deposition. I'm just saying that doesn't make sense to me.
17  Q.  The "received" part doesn't make sense to you. The rest of
18  it's accurate; correct?
19  A.  I'm reading off the page.
20  Q.  Do you have any reason to believe it isn't?
21  A.  Go ahead.
22  Q.  My question is do you have any reason to believe it isn't
23  accurate?
24  A.  Have you finished reading what you want to read?
25  Q.  Yes.

421

1   A.  It's an answer. I don't find anything --
2   Q.  There's no question pending.
3   A.  OK.
4   Q.  Now, do you recall to whom you -- withdrawn.
5          The 300,000, it could be paid to you or anyone you
6   designated it to be paid to; correct?
7   A.  I don't recollect the agreement to that effect.
8   Q.  If you'd like, you can look at Plaintiff's Exhibit 50, if
9   that would refresh your recollection.
10  A.  Do you have a line and save some time?
11  Q.  Sure. Hold on.
12  A.  Just roughly where in the page.
13  Q.  It's the second paragraph. It's, I think, the second
14  sentence, starts about five lines down, all the way on the
15  right side of the page.
16  A.  I see it.
17  Q.  And you'll agree with me that it is actually the company
18  McLean, according to this agreement, and the company is defined
19  as 455 Central Park West; correct?
20  A.  That's a partial reading of the sentence. The sentence
21  says, The company McLean -- the company being 455 Central Park
22  West LLC, basically McLean was the managing director, I
23  understand -- shall be obligated to pay to or at the direction
24  of Korff -- Joseph Korff -- 300,000, which payment will be made
25  by Columbia.

422

1          So, anyway.
2   Q.  My question was more about you had the discretion under the
3   agreement to direct the payment either to you or your designee;
4   correct?
5   A.  That's what it says, yes.
6   Q.  And, in fact, you did receive the $300,000 payment;
7   correct?
8   A.  Yes.
9   Q.  It was wire transferred into an account which is a personal
10  account of yours; it has a title of The Law Office of Joseph
11  Korff, but it's basically your personal account; correct?
12  A.  Yes.
13  Q.  Did you recognize any portion of that payment as income on
14  your tax returns?
15  A.  I can't honestly tell you. As I said earlier, the -- I had
16  large net operating loss carry-forwards, which means that while
17  it was a complicated transaction, even if the full 300,000
18  needed to be recognized as income, it would not have affected
19  my tax liability by one cent.
20         I relied generally in getting my returns done on my
21  bookkeeper, an accountant who's a part-time controller, an
22  accounting firm that actually prepared the tax returns.
23         Unfortunately, because of the large net operating loss
24  carry-forwards, they tended to do my returns in the last couple
25  of days or even the last day that they were due, which would,

423

1   during this period and for quite some time, have been October
2   15th of the year following when the return -- what the return
3   covered.
4          If I didn't get asked questions, I would have assumed
5   that would have been correctly reported. And if, in fact, I
6   subsequently discovered, as I have, although I can't remember
7   the details, income or expense that had been inadvertently
8   omitted, I would discuss that with the chief accountant that I
9   have a relationship with.
10         And his advice to me is that, at least for the ones
11  that I can remember, he was not planning on filing amended
12  returns; what he was planning on doing was adjusting the net
13  operating loss carry-forwards so they would either increase or
14  decrease based on whatever error we may have found.
15  Q.  Mr. Korff, you're a tax attorney; correct?
16  A.  Correct.
17  Q.  You have an LLM?
18  A.  I don't practice tax law, but I am.
19  Q.  But you practiced tax law for quite some time, didn't you?
20  A.  Yes.
21         MR. OBERDIER:  Your Honor, I'm going to object to this
22  entire line of questioning.
23         THE COURT:  Who prepared the return, Mr. Korff?
24         THE WITNESS:  My accountants.
25         THE COURT:  Is that an outside independent accountant?

424

1   of the return. And then, again, the fact that the fee was
2   paid, who it was paid and from who it was paid is not a
3   contested matter; so it seems really more just a prejudicial
4   attempt to show that his tax return was not filled out
5   correctly.
6           THE COURT: That you can argue on summation. But it
7   seems to me that he's giving a statement that this is what he
8   received. And they are entitled to show that it doesn't appear
9   on his tax return. Then he can give whatever excuse he has for
10  it not being on his tax return.
11          MR. OBERDIER: OK. Thank you, your Honor.
12          MS. WRIGHT: Your Honor -- sorry. Save the argument
13  for later.
14          THE COURT: Is that all right?
15          MS. WRIGHT: Yeah. I was just going to point out that
16  under the doctrine of quasi estoppel, which has been recognized
17  not only by the Southern District in the Meyer v. Insurance
18  Company of America case, that's 1998 Westlaw 709854, and then
19  Mahoney --
20          THE COURT: What are you pointing out? First tell me
21  what you're pointing out, then I'll listen --
22          MS. WRIGHT: Personal sworn statement on their tax
23  return estops them from taking a contrary position in a
24  litigation. So to the extent he did not declare the interest.
25          THE COURT: I hear you. But let's see what the

1   testimony shows.
2           MS. WRIGHT: OK.
3           (Continued on next page)

1           (In open court)
2           MS. WRIGHT: If I may ask, your Honor, Azeta Kasem,
3   who's going to be a witness this afternoon, is sitting at
4   counsel table. It's just been pointed out to me. I would ask
5   have her excluded from the courtroom.
6           THE COURT: She's going to be a witness?
7           MS. WRIGHT: Yes.
8           THE COURT: All right.
9           THE WITNESS: I believe it's Azeta, by the way.
10          MS. WRIGHT: I'm sorry. I'm very sensitive about the
11  pronunciation of my name, so I apologize.
12          THE WITNESS: I understand.
13          MS. WRIGHT: I believe there was a question pending.
14  If you wouldn't mind, could you please read it back.
15          (Record read)
16  A.  I reject your inference that signing a return, which has to
17  be under penalties of perjury, has a violation in it if the
18  return has a mistake, which is the inference of your question.
19          But, yes, I did sign the return. And I am aware that
20  if I intentionally omitted income of a certain large amount,
21  that I would be liable for criminal sanctions.
22          That -- well, whatever.
23  Q.  How much of the 300,000 was income to you?
24          THE COURT: I'm sorry?
25  Q.  How much of the $300,000 payment was income to you?

1   A.  I would need actually exhibits that I have prepared or I
2   asked an MBA in my office to prepare based on the Quick Books
3   entries.
4           THE COURT: No, not what is done now. At the time the
5   return was prepared, do you know how much of the $300,000 was
6   declared as income?
7           THE WITNESS: No, I don't.
8           THE COURT: Do you know how much was declared as
9   repayment of loan?
10          THE WITNESS: You wouldn't declare a repayment of
11  loan. So, for example, if I --
12          THE COURT: All right. Then OK. I've got your
13  answer.
14          How much was declared as interest received?
15          THE WITNESS: It's the same answer. I don't know.
16  The two elements that would --
17          THE COURT: Why don't you know?
18          THE WITNESS: Because I relied on my accountants to
19  prepare my returns based on my books and records.
20          I often got the returns, and I believe that is true
21  for October 2005, which would have been the return due for
22  2004, at the very last minute. And the returns are very long
23  and complicated. And going through them and matching them to
24  the books would have been an impossible task to file before the
25  due date.

1   THE COURT:  What papers were your accountants given?
2   THE WITNESS:  They were given all my books and
3   records.  And they had free access to my staff and to me to ask
4   any questions that those books and records would have raised.
5   THE COURT:  What books and records -- which books and
6   records are you talking about?
7   THE WITNESS:  For every single one of my entities and
8   my wife's entities or any entity that my wife or I would have
9   an interest in that contained information that would be
10  required to be put on the tax return.
11  THE COURT:  What about your bank account?
12  THE WITNESS:  Yes.
13  THE COURT:  Were the bank records given to him, to the
14  accountant?
15  THE WITNESS:  They are reflected in the computer
16  records.  In other words, the computer records contain all of
17  the entries back and forth within a tax return.  When they need
18  back-up for something, they ask for it and get it.
19  THE COURT:  It was prepared from computer records, not
20  from the actual bank statements?
21  THE WITNESS:  They would occasionally go through bank
22  reconciliations to try to answer a question.  They or the
23  controller was supposed to review the bank reconciliations that
24  Azeta would perform.
25  THE COURT:  Go ahead, Ms. Wright.

433

1   BY MS. WRIGHT:
2   Q.  You'll agree with me though that at least a portion of the
3   $300,000 that you received on July 30, 2004 was income;
4   correct?
5   A.  I'd have to look at what was recently provided to me; but
6   very likely some portion, it may have been as small as -- I
7   shouldn't even say that, because that's really not appropriate.
8       You report on a calendar-year basis.  There were
9   advances that I made in the books to Palermo-related entities
10  subsequent to July 30th, 2004.  I believe the only ones are
11  ones in relationship to a South Boston transaction.  But the
12  amounts advanced under those -- in the books for 2004 I think
13  was something in the nature of 92, 93, 97,000.
14      Now, if you were to try to do the accounting and try
15  to figure out on July 30th, 2004 -- if you stopped the books
16  and records then, you would have had records that -- it really
17  depended on how, I think, three transactions would have been
18  treated.  There were some three transactions in which money
19  came back.
20      Now, if they were allocated to interest, then you'd
21  get one number.  If they were allocated to principal, you'd get
22  another number.
23      And, in fact, the rate of interest at the maximum rate
24  of law was something that I didn't research at the time, but my
25  recollection would be 25 percent for loans to individuals --

434

1   I'm sorry, to corporations or limited liability companies or,
2   in effect, entities; 16 percent for loans to individuals.  And
3   if you recollect, I testified, I think, yesterday that my
4   advances to Palermo and his companies were joint and several
5   obligations.
6       So if, for example, an entity of Mr. Palermo paid me
7   back, do I calculate the entire interest rate for all of these
8   advances at the 25 percent rate?
9       (Continued on next page)

1

1   A.  So if you were an accountant who was given all of these
2   books and records, you would have to go to a lawyer to figure
3   out how to treat them once you had the facts of the
4   transaction.  And I think I had my MBA prepare 10 different
5   iterations of possible results.
6       THE COURT:  On this transaction?
7       THE WITNESS:  On this specific transaction because --
8       THE COURT:  You discussed it with your accountant,
9   this particular transaction?
10      THE WITNESS:  I don't recollect discussing it with my
11  accountant on this matter in connection with preparation for
12  trial.  The issue, I knew, would come up of how much of the
13  300,000 was interest, how much of it was services, how much of
14  it was principal.  And in order to make that computation, you
15  have to analyze all of the entries and make several
16  determinations.  So I had him run results under all of these
17  determinations.  I attempted to do it on the most conservative
18  basis that I could.  And that is your answer.
19      THE COURT:  You are talking about in connection with
20  this suit?
21      THE WITNESS:  Yes.
22      THE COURT:  I am asking you about what did you do at
23  the time that the return was prepared.  Did you discuss this
24  transaction with your accountant --
25      THE WITNESS:  I'm sorry, your Honor.

436

```
1          THE COURT:  -- because it just appears as $300,000; it
2    wouldn't appear broken down on the books.
3          THE WITNESS:  I don't recollect discussing this
4    transaction with my accountant.  In preparation for trial, I
5    noticed that Ms. Kasem had taken the 300,000 and run it into a
6    loan account.  And in that loan account for the year on that
7    particular account, you had a negative balance of money.
8          Now, if I were a tax lawyer reviewing that set of
9    books or at least a senior level accountant, and maybe even a
10   junior level accountant I would have said, now, wait a minute,
11   I have a negative interest here on what is supposed to be a
12   reflection of what Mr. Palermo owes Mr. Korff, at least as in
13   this individual account.  That should have given rise to
14   questions of, how do I book the transaction.  You also have
15   other entries that would be in my individual return that had
16   positive, in effect, obligations.  So the question should have
17   been raised.  I don't recollect discussing it with my
18   accountant.
19         THE COURT:  Let me ask you another question.
20         You had a discussion with your accountant about what
21   the maximum rate of interest would be?
22         THE WITNESS:  No.  That was a legal determination.
23         THE COURT:  That was not discussed with your
24   accountant?
25         THE WITNESS:  No.  I didn't discuss the transaction --
```

```
1    I don't recollect discussing the transaction.
2          THE COURT:  I am sorry, Ms. Wright.
3          MS. WRIGHT:  That's all right, your Honor.
4    BY MS. WRIGHT:
5    Q.   When you took the assignment and when you received the
6    $300,000 on July 30, 2004 --
7    A.   Please.  I am very tired.  You can repeat the question but
8    your start is wrong.
9    Q.   Excuse me.  I am going to ask the question the way I want
10   to ask the question --
11         THE COURT:  Let's ask the question, period.
12         THE WITNESS:  I'm sorry.  Could you repeat the
13   question or read it back.
14   Q.   I didn't get a whole question out, but I will frame a new
15   one.
16   A.   Thank you.
17   Q.   You knew when you reached the agreement with Mr. Palermo to
18   satisfy his outstanding obligations to you in terms of the
19   advances, the interest and the fee in connection with the 455
20   CPW transaction that at least 100,000 of it was going to be
21   income, correct?
22   A.   No.
23   Q.   You testified yesterday --
24   A.   By the way, I think there are factual premises in your
25   question that are inaccurate.
```

```
1          THE COURT:  Go ahead.  Ask a question.
2    Q.   You testified yesterday that it was your recollection that
3    you had advanced approximately $200,000 between 1996 --
4    A.   That was actually one of the corrections that I wanted to
5    give you.  My wording should have been more than $200,000.  I
6    don't recollect the precise amount.
7    Q.   But your best recollection, your best estimate was
8    $200,000, correct?
9    A.   That was what the transcript said.  That was one of the
10   corrections that I wanted to make that I forgot to ask before
11   you started your questioning.
12   Q.   Are there any documents that you reviewed last night that
13   refreshed your recollection?
14   A.   It is not a question of documents.  It is a question of
15   reading the transcript and knowing that in my conversations
16   with Mr. Palermo, which I believe I testified to, my
17   recollection was that it was more than 200,000.
18         But I also said yesterday, my books are what they are.
19   They reflect what they do.  And depending on how you do the
20   calculations with the assumptions that I have already
21   described, the many different assumptions that you could make,
22   that number could be less than 200,000 or more than 200,000.
23   Q.   How much more?
24   A.   1 think I saw one iteration that had it at 207,000.
25   Q.   Anything more than 207?  Anything on a magnitude greater
```

```
1    than $207,000?
2    A.   I actually need your question read back because as I think
3    I said earlier, there were subsequent advances in 2004.  I am a
4    calendar year taxpayer.  It related to the Boston transaction.
5          I don't know what the proper tax treatment would be.
6    I am a tax lawyer.  I have received a master's in taxation but,
7    frankly, when they changed the Code completely in 1986, I sort
8    of said, I have to get out of this business.  But I have not
9    practiced tax law in well more than a decade.
10         So I don't know what, under the law applicable in
11   2004, would have been the proper treatment for some 91 to
12   97,000 dollars of advances in that transaction and I didn't
13   complete -- that happened in 2004.
14         And, in addition, the facts on the ground, I think,
15   based on the timing of when that return would have had to have
16   been filed, October 15, 2005, might have shown -- and I believe
17   they would show -- that that entire amount would be a write-off
18   in some fashion.  So I can't give you a definitive answer.
19   Q.   You are not suggesting that the advances that you made
20   subsequent to July 30, 2004 somehow offset income that you
21   earned, are you?
22         MR. OBERDIER:  Objection, your Honor.  Is she asking
23   him a tax question now or a claim in this litigation?
24         MS. WRIGHT:  I am trying to understand his answer.
25   A.   My answer was, I don't know the proper tax treatment of
```

1   some 92 to 95,000 dollars -- or 97,000 -- of advances made in
2   2004 that had some connection to Mr. Palermo. And my
3   understanding is that, by the time the return was due on
4   October 15, 2005, that advance, in effect, was wiped out.
5   Q. Mr. Korff, you didn't make those advances in connection
6   with the transaction in Boston, South Boston, did you? You
7   didn't make those advances; Arc Development made those
8   advances?
9   A. Those advances are booked in my books under Arc
10  Development, but Arc Development LLC is a pass-through entity,
11  so for income tax purposes, all of its attributes would apply
12  to my individual tax return.
13  Q. But on a different schedule of your return, correct?
14  A. You are beyond what I would assume what would be my current
15  pay grade.
16  Q. You don't know what a Schedule C is?
17  A. I certainly do. But any income that I got from services
18  would also be on a Schedule C, if I individually got them.
19  Q. Interest income would be there also, correct?
20  A. I am not certain. I actually believe interest income is in
21  something called a Schedule E, but I don't remember.
22  Q. Schedule B, does that sound right?
23  A. I said E.
24        THE COURT: Schedule what?
25        THE WITNESS: Schedule E.

441

1         THE COURT: You said E, not B?
2         THE WITNESS: Right. But I could be wrong. It could
3   be B.
4         As I said, I prepared my returns by myself for I and
5   my business entities through about 1991 or 1992. And it just
6   became too much of a burden because the returns became very
7   complicated when my wife became a partner at a firm with
8   activities throughout the United States and internationally.
9   BY MS. WRIGHT:
10  Q. You will agree with me, though, given that your best
11  recollection is that the advances made between 1996 and July
12  30, 2004 totaled approximately $207,000, that at least $93,000
13  was income of some sort, either interest or fee income,
14  correct?
15  A. If you stop my books at July 30, 2004 and then prepared a
16  tax return based on that, but that's not the way the law reads.
17  Q. How does it read?
18        MR. OBERDIER: Your Honor, I object to that.
19        MS. WRIGHT: He is --
20  A. You file tax returns based on the tax period that is your
21  set accounting method. I was a calendar year taxpayer.
22  Q. Can I turn your attention to Plaintiff Exhibit 74, please?
23        THE COURT: 74?
24        MS. WRIGHT: Yes, your Honor.
25  A. OK.

442

1   Q. Can you identify Plaintiff Exhibit 74 for me, please?
2         MR. OBERDIER: Your Honor, I object to a new exhibit
3   being offered on their case-in-chief. It was not on their
4   exhibit list which under the rules they were required to show
5   to us several weeks in advance.
6         MS. WRIGHT: Your Honor, if you recall, you ordered
7   Mr. Korff to produce his tax return last Friday.
8         THE COURT: Yes. I am going to allow the questioning
9   with respect to Plaintiff Exhibit 74.
10        THE WITNESS: Go ahead.
11        THE COURT: Do you want to put it in evidence?
12        MS. WRIGHT: I would.
13        THE COURT: Any objection?
14        MR. OBERDIER: Yes. I would have an objection. First
15  of all --
16        THE COURT: If that is what you want, I will have to
17  hear it at the sidebar.
18
19        (Continued on next page)
20
21
22
23
24
25

443

1         (At the sidebar)
2         MR. OBERDIER: Your Honor, I consider, first, the
3   timing of this to be highly prejudicial. There is nothing new
4   that has come up in the last two years that would have caused
5   them not to have requested this in discovery and properly mark
6   it as an exhibit. And, frankly, this is properly the subject
7   of expert testimony which they did not designate.
8         THE COURT: If you want an instruction with respect to
9   it, but to the extent that it may consist of an inconsistency
10  with his testimony --
11        MR. OBERDIER: How?
12        THE COURT: I don't know what the situation is here
13  but --
14        MR. OBERDIER: My objection is, how could the jury or
15  how could I possibly as his counsel be prepared to meet any of
16  this without my own expert which I had no opportunity to engage
17  because they did not identify an expert over highly technical
18  questions of tax accounting. I frankly have no idea of what
19  the discussion has been before. And I was entitled to notice
20  of this expert questioning from an expert so that I could get a
21  rebuttal expert in order to meet it. Mr. Korff is doing the
22  best he can. I am flying blind and I think it is highly
23  prejudicial. This is not a question of surprise that they
24  needed at the last time. They could have done this three years
25  ago.

444

THE COURT: Now, you asked a question, Mr. Oberdier, about the Beekman and other companies -- what companies did you understand, Mr. Korff, Mr. Palermo operated?

THE WITNESS: Argus Management, N. M. Palermo LLC, Beekman Street Advisory Corp.

Give me a minute to try to refresh my recollection.

Norfolk something; I don't have the full name.

Well, I can tell you this, your Honor. Butterfield Trust 1 LLC was, to my understanding, when I executed the document and received the 300,000 at both instances, not an entity owned or controlled by Douglas E. Palermo.

BY MR. OBERDIER:
Q. But in your prior testimony or in your remarks in depositions when you referred to dealing with Doug, was it your understanding that he was representing Butterfield for purposes of those discussions?
A. Absolutely not.
Q. And why not?
A. Because I had been informed. And the signatory so indicated that it was --
   MS. WRIGHT: Objection, your Honor.
   THE COURT: Objection overruled.
A. -- that the entity was an entity that was controlled, depending on the time period, either by a Mr. Buchanan or, at a subsequent later time, a Mr. William Chipman; and that the

537

beneficial owners of that entity were, in fact, trusts for the benefit of each of his two children, Olivia and Grant. That's my understanding of that entity.
Q. And as of July 30th, 2004, at any time on or before that date, did you have any reason to doubt that information?
A. None.
Q. Do you still have -- and I'm sorry, because I don't have what you have up there in front of you. Do you still have Plaintiff's Exhibit 74, which was your tax -- you and your wife's tax return?
A. Yes, I do.
Q. Now, just regarding the portion of the tax return that related to your business, did you owe any taxes for that year?
A. No.
Q. Why not?
A. The return shows that the net operating losses that were being carried forward from that year were in the amount of 93 million 800.
   THE COURT: 93 what?
A. $93,824,156.
   Now, just so that you can get the full context, yes, that's my testimony.
Q. So regardless of how a $300,000 fee had been treated in that year, would that have affected the amount of taxes that you owed?

538

A. No.
Q. So would that be something that would be considered material?
A. No.
   MR. OBERDIER: Your Honor, we have here -- may I approach the witness and the Court and show a couple of exhibits? These are the general ledgers.
   THE COURT: I thought they were in evidence.
   MR. OBERDIER: Well, they are three accounts; they only put one of them into evidence.
   THE COURT: All right. Do you have any objection?
   MS. WRIGHT: No, your Honor.
   THE COURT: Give them numbers and names.
   THE WITNESS: Can I help you expedite?
   THE COURT: That's what he's hired for.
   MR. OBERDIER: I apologize, your Honor. They just entered the courtroom momentarily.
   THE COURT: Defendant is offering defendant exhibit -- you have to help me now.
   THE DEPUTY CLERK: Oh.
   THE COURT: Is that an R? Is this an R?
   MR. OBERDIER: It is, your Honor.
   THE DEPUTY CLERK: It is, OK.
   MS. WRIGHT: I just haven't been told which ones are which, your Honor.

539

   THE COURT: That's what I'm trying to --
   MS. WRIGHT: OK.
   THE COURT: Defendant's Exhibit R is Arc Development LLC general ledger as of December 31st, 2005.
   MS. WRIGHT: No objection.
   THE COURT: And Defendant's Exhibit S is JKPK general ledger as of December 31st, 2005.
   These are not fastened together, but they have a rubber band on them.
   Is there another one?
   MR. OBERDIER: Your Honor, just the ones we mentioned, R and S.
   THE COURT: Just those two, R and S. And they have been admitted without objection.
   (Plaintiff's Exhibits R, S received in evidence)
   THE COURT: Any questions about these documents?
   MR. OBERDIER: If you start with Defendant's Exhibit R, Mr. Korff.
   THE COURT: Are you going to go through these documents?
   MR. OBERDIER: I'm sorry?
   THE COURT: Are you going to go through these rather lengthy documents.
   MR. OBERDIER: No, we're not going to go through these line-by-line, your Honor, or even page-by-page.

540

```
 1    benefit of creditors in such action or special proceeding, and
 2    the creditor, receiver, trustee in bankruptcy, or assignee for
 3    the benefit of creditors shall have judgment therefor against
 4    the debtor and the transferee who are defendants in addition to
 5    the other relief granted by the judgment."
 6         There is another sentence that I could read into the
 7    record, but that is the gist.
 8         We respectfully submit that we believe that there is
 9    sufficient evidence in the record from which the jury can
10    conclude that the trustee has met all of the elements under
11    Section 276 and that 276-a mandates an award of attorneys' fees
12    should they so find.
13         In addition, I would like to point out that our
14    complaint in the wherefore clause made a demand for attorneys.
15         MR. OBERDIER: Your Honor, that is actually not my
16    recollection. I do not remember seeing attorneys' fees, but
17    let's put that aside.
18         Obviously, a claim under 276-a must be separately
19    pled. Pleading at the close of trial when we have been
20    represented for by plaintiff's counsel that they would not be
21    seeking such a claim is incredibly prejudicial and last-minute
22    surprise and should be denied on that basis.
23         Moreover, Ms. Wright did not --
24         THE COURT: Is that a matter for the jury or a matter
25    for the Court?
```

577

```
 1         MR. OBERDIER: It is a matter for the jury.
 2         MS. WRIGHT: No. It is a matter for the Court.
 3         THE COURT: Attorneys' fees, seems to me, whether they
 4    are entitled -- certainly the award of attorneys' fees, they
 5    would have to look at the hourly rates and --
 6         MR. OBERDIER: This isn't under any sanction rule or
 7    Rule 11. This is under DCL 276-a where it is explicit under
 8    the case law that a showing of actual fraud not based on
 9    inference, not based on speculation, not based on argument, but
10    based on actual evidence of fraud on the part of Mr. Korff and
11    Mr. Palermo must be shown.
12         Ms. Wright didn't even respond to my motion for
13    directed verdict on the question of actual fraud. How could
14    they actually show actual fraud against Mr. Korff when the
15    undisputed evidence is that he had no knowledge of anything
16    that Mr. Palermo was doing with respect to his creditors?
17         I really do challenge plaintiff's counsel to point to
18    one piece of evidence in the record that shows that Mr. Korff
19    had any --
20         THE COURT: I was covering 275 and 273. What about
21    the evidence of intent to defraud by Mr. Korff?
22         MS. WRIGHT: I don't believe it is the transferee's
23    actual intent that controls.
24         THE COURT: What?
25         MS. WRIGHT: I don't think, under the statute, it is
```

578

```
 1    transferee's actual intent that controls, but even if it
 2    does --
 3         THE COURT: As I understood 276, I didn't think it did
 4    either. You had to have fraud on behalf of Mr. Korff. But
 5    that he should pay under 276-a -- 276-a you certainly do.
 6         MS. WRIGHT: Pardon?
 7         THE COURT: Under 276-a, you have to have intent to
 8    defraud by Mr. Korff.
 9         MS. WRIGHT: Your Honor, I think there is evidence in
10    the record, for example, I think the evidence that I just
11    referenced in terms of the structure of the $300,000 payment
12    and the exchange of added consideration and the exorbitant rate
13    of interest, if you could call it a loan, that would accrue on
14    a principal of $75,000 and payments less than a year later of
15    300,000 --
16         THE COURT: That goes to 273, 274, 275, it seems to
17    me. We are talking about 276.
18         MS. WRIGHT: Your Honor, he didn't declare the income
19    on his tax return.
20         THE COURT: It wasn't declared. There might be
21    another -- that is a pretty hefty tax return you have there.
22         Intent to defraud --
23         MR. OBERDIER: The undisputed evidence is that
24    Mr. Korff had a $96 million loss that year.
25         THE COURT: I heard that.
```

579

```
 1         MR. OBERDIER: It is not material.
 2         THE COURT: The intent to defraud is what I am looking
 3    at. What is the proof of the intent to defraud? What is the
 4    proof that he knew -- well, he knew. He certainly knew that
 5    Mr. Palermo didn't have money because he was loaning him money
 6    all the time.
 7         MS. WRIGHT: That's correct.
 8         THE COURT: But it doesn't show that he knew that
 9    Mr. Palermo -- where in the evidence does it show that he knew
10    that Mr. Palermo was insolvent?
11         Well, he might know that he is insolvent, but that he
12    intended to defraud his creditors or to hinder or delay them
13    and recover the money owed.
14         MS. WRIGHT: Your Honor, he participated in the
15    structuring of the transaction that got him paid by a third
16    party. You would have to accept the fact that there is no
17    evidence from which the jury could conclude that over the
18    course of 20 years, when Mr. Palermo needs to get amounts
19    varying from $450 from him to five figures -- probably more
20    than a than a lot of these people make in one year.
21         THE COURT: That is not relevant to this.
22         MS. WRIGHT: Understood.
23         THE COURT: Obviously, some of these loans were for
24    amounts more than Mr. Palermo's personal upkeep or whatever you
25    want to call it. They were amounts -- some of them were
```

580

10/27/2010  Trial Day 3 - Korff - evidence closed

```
 1          MS. TUCKER:  I just want to see which one he's reading
 2   off of.
 3          THE COURT:  Shouldn't it go, let's say, on page 16,
 4   before I get to definitions, and incorporate that language on
 5   page 16 before definitions.
 6          MS. TUCKER:  Your Honor, we would propose that it
 7   would have the language then of the bankruptcy code, Section
 8   550, that says the trustee may recover.
 9          THE COURT:  I cannot use 550.  If you want me to take
10   550 in, I'll say what 550 says.
11          MS. TUCKER:  Yes, your Honor, you can take 550.
12          THE COURT:  Then I don't know if that's the place to
13   put it.  I'll put it in -- maybe it would be better if it goes
14   to the top of page 15 under 550, and then go to 544.
15          MS. TUCKER:  That's fine, your Honor.
16          THE COURT:  All right?  OK?  All right.
17          MS. TUCKER:  One other thing, your Honor.  On the
18   bottom of page 22, there's a carryover word, however, comma.  I
19   just want to make sure that there's nothing more attendant or
20   that word should even be there.
21          THE COURT:  I guess the word shouldn't be there.  Am I
22   right?
23          MS. TUCKER:  Thank you.
24          THE COURT:  Good catch.
25          MS. TUCKER:  I owe that to Mr. Monahan.
```

589

10/27/2010  Trial Day 3 - Korff - evidence closed

```
 1          THE COURT:  Otherwise, are we all right?
 2          MR. OBERDIER:  Your Honor, actually, the defendants
 3   have rather more requested changes.  The Court's charge seems
 4   more, frankly, drawn from the plaintiff's request than ours.
 5   But there are a couple things we think crucial the jury be
 6   instructed on.
 7          First, as set forth in my directed verdict motion,
 8   which I understand the Court denied, we do have a seriously
 9   disputed issue of fact as to whether this is a transfer for
10   Mr. Palermo.  So I think the jury should be instructed --
11          THE COURT:  I thought -- I meant to include that
12   point.  We did include that?  I know I made that point -- I
13   think it's in there.  That's one of the changes from the first
14   to the second draft when I realized you were contesting that
15   issue.
16          MR. OBERDIER:  I don't see it.  I'm looking at what
17   your Honor distributed this morning.
18          THE COURT:  Page 18.  And it should be in each one of
19   the causes of action.  First element of each cause of action
20   raises that.
21          I used a different format than you used, Mr. Oberdier,
22   or the plaintiff used.  But it is based on the plaintiff's
23   request.  And then when I saw your request, I made an
24   additional element there of transfer.
25          MR. OBERDIER:  There's also something that I believe
```

590

10/27/2010  Trial Day 3 - Korff - evidence closed

```
 1   is wrong as a matter of law, and that definition of fair
 2   consideration on page 16.
 3          The law is clear, as we cite in support of our request
 4   to charge No. 9 in our amended charges, that it is the
 5   transferee, Mr. Korff, that must be shown to have acted in good
 6   faith, not the transferor, Mr. Palermo.  If Mr. Korff gave fair
 7   consideration and acted in good faith, then there is fair
 8   consideration and it doesn't matter what Mr. Palermo was up to.
 9   And, as I say, that's specifically --
10          THE COURT:  Fair consideration has to be received by
11   Mr. Palermo.  You think it's the transferee that has to act in
12   good faith?  I thought it was the transferor, because the
13   general thought is it's the fraudulence of the transferor that
14   is the issue.
15          MR. OBERDIER:  Your Honor, I'm quoting from the Second
16   Circuit case, HBE Leasing Corp., that says, If, quote, a
17   transferee has given equivalent value in exchange for the
18   debtor's property, the statutory requirement of good faith is
19   satisfied.  If the transferee acted without either actual or
20   constructive knowledge of any fraudulent scheme, that's cited
21   in several other cases, as well.
22          THE COURT:  Is that a husband/wife situation?
23          MR. OBERDIER:  HBE Leasing Corp. v. Frank does not
24   sound like a husband/wife situation.
25          THE COURT:  A lot of the cases you showed me were
```

591

10/27/2010  Trial Day 3 - Korff - evidence closed

```
 1   husband/wife situations, and also involved conveyances of real
 2   property, which is not relevant in this.
 3          MR. OBERDIER:  I agree.  But these cases are not --
 4          THE COURT:  Give us the cases; we'll look at them.
 5          MR. OBERDIER:  Would you like the cite, your Honor,
 6   or --
 7          THE COURT:  Just go to the sidebar.  I have another
 8   matter I have to get onto.
 9          MR. OBERDIER:  OK.
10          We also believe, your Honor, and this is very, very
11   important, given that we have certainly established, as
12   Mr. Korff testified to, a certain amount of consideration up to
13   $260,000 in amnesty of debts, plus whatever the jury finds
14   Mr. Korff's services were worth, and so, therefore, we do
15   believe that on our request to charge No. 18, which is drawn
16   from 272-2 of the debtor and creditor law that says the jury
17   can find partial consideration and award only the delta should
18   be given.
19          THE COURT:  Just one second.  Isn't that the section,
20   272-2 -- the one you did cite to me in the charge was a charge
21   which Ms. Wright pointed out is a charge that has to do with
22   only real estate transfers.
23          MR. OBERDIER:  The cite, your Honor, is --
24          THE COURT:  I'm pretty sure that's correct.  She
25   pointed that out, and we researched it, and that's what it
```

592

1  turned out to be; all real estate, both in the pocket part and
2  in the section.
3      MR. OBERDIER: Your Honor, I believe that was a
4  question that set off recoupment.
5      THE COURT: That's right.
6      MR. OBERDIER: But this is a different section. This
7  is 272-2.
8      THE COURT: All right. Let me look at it.
9      MR. OBERDIER: And I can give at sidebar --
10     THE COURT: These new charges that you gave in?
11     MR. OBERDIER: Yes, your Honor.
12     MS. TUCKER: Your Honor, we received this, I think,
13 close to 3 a.m. last night.
14     MR. OBERDIER: Your Honor, I would much rather be the
15 sendee than the sender at 3 a.m.
16     MS. WRIGHT: Well, we were there, don't worry.
17     THE COURT: Well, it seems to me to be the law, 272.
18 Do you want to comment on it? I don't mind putting it in.
19 It's the law.
20     Any reason to believe it isn't the law?
21     MS. TUCKER: Your Honor, I'm just looking for the
22 case.
23     THE COURT: All right. Do you have much more besides
24 that, Mr. Oberdier?
25     MR. OBERDIER: I believe I only have -- I have one

593

1  other request, and that is given the evidence, your Honor, of
2  the oral arrangements between Mr. Korff and Mr. Palermo, we do
3  believe that the jury should be instructed in accordance with
4  the federal jury practice instructions that you can have an
5  oral contract. And, again, that's our request to charge No.
6  16.
7      THE COURT: We'll take those under consideration. And
8  let's meet at 9:15 in the morning, and I'll hear the objections
9  of the plaintiff to those charges.
10     MS. TUCKER: Yes, your Honor. I'll have a letter to
11 you before that so that you're aware of the cases.
12     THE COURT: That's even better.
13     MS. TUCKER: Thank you.
14     MR. OBERDIER: And, your Honor, I believe your Honor
15 made a ruling on this. I'm not positive, but, if so, we would
16 like to preserve our objection.
17     In our request No. 23, we cite numerous authorities
18 showing that for a Section 276, the majority rule is that
19 actual intent to defraud on the part of both the transferee and
20 the transferor is required under New York law.
21     THE COURT: I couldn't find support to that. Maybe
22 you better give the support to Ms. Gebremariam.
23     MR. OBERDIER: All right. We can do that at sidebar,
24 your Honor.
25     THE COURT: And you better give it to the plaintiff,

594

1  too. Give it to the plaintiff, too.
2      Let's see if we can get going tomorrow.
3      (Adjourned to October 28, 2010 at 9:15 a.m.)

595

                    INDEX OF EXAMINATION
Examination of:                              Page
JOSEPH KORFF
Direct By Ms. Wright  . . . . . . . . . . . . . 404
Cross By Mr. Oberdier  . . . . . . . . . . . . 493
Redirect By Ms. Wright  . . . . . . . . . . . 552
                    PLAINTIFF EXHIBITS
Exhibit No.                                 Received
 74    . . . . . . . . . . . . . . . . . . . . 454
 75    . . . . . . . . . . . . . . . . . . . . 463
 75    . . . . . . . . . . . . . . . . . . . . 475
 R, S  . . . . . . . . . . . . . . . . . . . . 540
                    DEFENDANT EXHIBITS
Exhibit No.                                 Received
 B     . . . . . . . . . . . . . . . . . . . . 525

596

```
 1     UNITED STATES DISTRICT COURT
 1     SOUTHERN DISTRICT OF NEW YORK
 2     ------------------------------x
 2
 3     DAVID R. KITTAY,
 3
 4                Plaintiff,
 4
 5          v.                              08 CV 7421 (RPP)
 5
 6     JOSEPH KORFF,
 6
 7                Defendant.                JURY TRIAL
 7
 8     ------------------------------x
 8                                          New York, N.Y.
 9                                          October 28, 2010
 9                                          9:50 a.m.
10
10     Before:
11
11                   HON. ROBERT P. PATTERSON, JR.,
12
12                                          District Judge
13
13                          APPEARANCES
14
14     STORCH AMINI & MUNVES, P.S.
15          Attorneys for Plaintiffs
15     BY:  BONNIE A. TUCKER
16          LITA BETH WRIGHT
16
17     SCHIFF HARDIN, LLP
17          Attorneys for Defendant
18     BY:  CARL W. OBERDIER
18
19
19
20     ALSO PRESENT:   ANDREA MARCUS, ESQ., Arc Development
20                     THOMAS MONAHAN, Law Clerk
21                     GARY LAMPERT
21                     JOSEPH KORFF
22
23
24
25
```

 1          (In open court, jury not present)
 2          THE COURT:  I had made changes in the charge, but one
 3     of the difficulties I had this morning anyway, I had not
 4     received Ms. Tucker's letter which came in after I left last
 5     night -- well after.  She seems to have burned the midnight
 6     oil, 1:24 a.m., according to the fax.
 7          MR. OBERDIER:  Your Honor, I am sure we would all
 8     appreciate an order from the Court that as soon as this trial
 9     is over, that all counsel are excused from any further duties
10     on any further cases and we can go home and sleep.
11          THE COURT:  She raises issues about the amended
12     request to charge number 18 on partial consideration and
13     says -- and I can't find it in Section 272(2) -- on the other
14     hand, the partial reconsideration section that we had used in
15     the charge was only Section A, and it seemed that 272 has two
16     sections, A and B.  It seems to me that I should include both
17     sections, A and B.  Does anyone disagree with that?
18          MR. OBERDIER:  No, your Honor, we don't disagree with
19     that.  And just to make this clear, in real world terms, let's
20     just say that the jury finds that we have established $250,000
21     of fair consideration and that there was no bad faith on the
22     part of Mr. Korff.  The case law is clear that, under those
23     circumstances, they are free to find that there was inadequate
24     consideration for the remaining 50 and to order that, but they
25     certainly can't award the entire amount of the 300,000 and

 1     that's all that that instruction is getting at.
 2          MS. TUCKER:  Your Honor, but the case he cites goes
 3     back to 278 and the set-off amount.  He is relying on a 278
 4     case.  It is a husband-and-wife case in a real property case I
 5     thought that we discussed yesterday and found did not apply.
 6          THE COURT:  I think you are right.  Those are the
 7     husband-and-wife real estate cases.
 8          MR. OBERDIER:  Your Honor, C & B was Lloyd's of London
 9     purchase of a company.  It was not a husband-and-wife case --
10          THE COURT:  Which case are you referring to?  Maybe
11     Ms. Tucker didn't cite that case.
12          MR. OBERDIER:  It is C & B International.
13          THE COURT:  That is the one she did cite, and that was
14     not one that I was able to read last night.  I read the Sharp
15     case.
16          Let me see the C & B International case, because she
17     says that applies to 278 which we looked at.  And 278 of the
18     Debtors and Creditors Law seems to be limited to real property
19     transfers.
20          MR. OBERDIER:  Your Honor, 278(2) --
21          THE COURT:  I have some trouble reading the blue line
22     in the case that you have handed up.  You have shaded it.
23          MR. OBERDIER:  Your Honor, I have an unhighlighted
24     version, if that is helpful.
25          THE COURT:  It is 278(1).  That has to do with real

 1     property transfers, as I understand it.
 2          MR. OBERDIER:  Your Honor, there is nothing in the
 3     text of the statute that says real property --
 4          THE COURT:  But all the cases seem to be real
 5     property.
 6          MR. OBERDIER:  But this case is not real property.
 7          THE COURT:  I will have to read the beginning.
 8          MS. TUCKER:  Your Honor, I think it is tangible
 9     property and it was purchased for fair consideration.
10          MR. OBERDIER:  That is not true, your Honor.  It was
11     specifically found that it was purchased for less than fair
12     consideration but without actual fraudulent intent, in which
13     case the transferee could only be liable for the amount of the
14     inadequate consideration.
15          MS. TUCKER:  Your Honor, the case involved the
16     purchase of assets of one company by another.  There was no
17     purchase of anything -- we are talking about money which is an
18     intangible item.  278 is tangible items -- securities, assets,
19     real property -- not money.
20          MR. OBERDIER:  That is just not consistent with the
21     text of the statute, your Honor.
22          THE COURT:  It seems to be the only way it is applied.
23          MR. OBERDIER:  Again, your Honor, I think it is partly
24     just a question of fairness.  If there is a good faith
25     transaction and the two parties --

THE COURT: Are you addressing this as to the fourth cause of action?

MR. OBERDIER: No, your Honor. The fourth cause of action, you have to show actual fraud on the part of the parties. This is a question just of fair consideration for the first three causes of action. An element of fair consideration is good faith, and we have cited cases that good faith must be on the part of the transferee. So if there is good faith.

THE COURT: What case are you referring to on good faith of the transferee other than 276? And 276, to hold Mr. Korff liable, you have to show that he knew or should have known of Mr. Palermo's intent to defraud his creditors or limit his creditors. That is pretty clear from the cases.

MS. TUCKER: That is constructive fraud under 273 to 275. 276, we just have to show the actual intent on the part of Mr. Palermo to hinder, defraud or delay his creditors.

THE COURT: And you have to show that Mr. Korff knew or should have known of Mr. Palermo's fraudulent intent.

MR. OBERDIER: That's absolutely correct, your Honor. There is a split of authority. Some cases go even further than what your Honor just said and say that you have to show actual intent to defraud. We cited Court of Appeal cases saying that. But if your Honor chooses to go with the alternative, it is exactly what your Honor just said, which is that at the least you have to show knowledge.

THE COURT: It is pretty clear that the cases hold that. But that is 276.

MR. OBERDIER: Yes. And I am very sorry, your Honor, but we were talking before about 273 to 275 and you had posed a question to me, and now I have forgotten it.

THE COURT: You were talking about 273, 275. You were talking about partial consideration, I guess. And we were talking about C & B International and your reliance on 272.

MR. OBERDIER: And 278(2).

THE COURT: And 278(2). And it seemed to me that Ms. Tucker was right on 278(2) -- or 272(2). It doesn't apply. There isn't any 272(2).

MR. OBERDIER: Then the second question that your Honor had asked me was, does the transferee, for purposes of fair consideration under 273 through 275, need to have had good faith as opposed to the transferor. We have cited several cases including HBE, which is a Court of Appeals case.

THE COURT: Well, I read HBE, and that involved the wife of one of the principals of HBE furnishing the corporation with cash and the full value of two mortgages that she received from the corporation. And then the corporation got the money and turned it over to her son who was the chief executive of the corporation.

It was held that she was deemed to have knowledge -- the farther you get into this -- that transaction was voided.

And then the other lease, the corporation used for its own purposes. So that part of it was fair consideration for, and, also, the other part was that they paid their attorneys with it on the valid claim of the attorneys and, therefore, that was consideration. They didn't have to cough up what they paid the attorneys or what they used for their own corporate purposes.

MR. OBERDIER: And the point is, the precise quote from HBE is that, in connection with what your Honor just said, "If a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of good faith is satisfied if the transferee acted without either actual or constructive knowledge of the fraudulent scheme."

THE COURT: It wasn't a fraudulent scheme in that instance because the money was paid for valid debts of the corporation. I don't know, supposedly. They may have given the preference to those attorneys. I don't know --

MR. OBERDIER: Even then the court says that a transfer motivated by actual fraudulent intent on the part of the transferor may not be voided if the transferee who paid fair consideration did not have actual or constructive knowledge of such intent.

We are not disputing that for these purposes they have to show lack of fair consideration. But as your Honor's charge currently reads, even if the jury finds that there was fair consideration, but finds that Mr. Palermo was engaged in fraud,

that satisfies their burden of proof. That is reversible error under the Second Circuit's law.

THE COURT: Under what case?

MR. OBERDIER: It is the HBA/HBE case in the Second Circuit.

THE COURT: But the HBA doesn't hold that, though, does it?

MR. OBERDIER: There are several HBA cases. Let me make sure that you have the correct cite that we are talking about. It is 448 F.3d --

THE COURT: I don't have it in front of me. I was just reciting the facts as I read them. I don't have them in front of me, so I can't tell you what cite it was. But the point is, with respect to the facts, as I understand it, the wife of one of the principals of HB furnished the full amount of the mortgage in cash, full amount of two mortgages in cash to the corporation and it was for two mortgages that she received. She claimed she didn't have knowledge that her son was going to take all that money, but she was held liable, regardless of her claim of lack of knowledge because he took the money. Now, it is true that there was a relationship between the two, but that is that issue.

MR. OBERDIER: If I understand what you are saying, frankly, it could be that the specific statement of the law by the Second Circuit could be considered dicta, but the Second

1   Circuit did very specifically pronounce on the law, which is
2   that the transferee's good faith is a defense under 273 to 275
3   so --
4       THE COURT: It then held that it wasn't a defense.
5       MR. OBERDIER: It held that it was.
6       THE COURT: No. They held that it wasn't. They held
7   her liable.
8       MR. OBERDIER: Because she had not shown good faith.
9       I do think, with due respect, your Honor, that the
10  statement which is an exact quote: "However, a transfer
11  motivated by actual fraudulent intent" --
12      THE COURT: Do you want to hand it up?
13      I am going to hand out a new copy of what we have done
14  so that you can see what we have done and you can read it -- I
15  hate to hold the jury up while you are doing that -- and then
16  you can make your suggestions, and both sides can work on it
17  because I had to do some work on that charge.
18      MR. OBERDIER: Your Honor, just to make this go
19  expeditiously, is there a red line?
20      THE COURT: No. I don't have a red line. I can tell
21  you where the changes are as best I can.
22      I moved the burden of proof issue up close to the
23  substance of the charge, just because I think it is better
24  there.
25      MR. OBERDIER: Thank you, your Honor.

1       THE COURT: So you really begin the fourth -- where is
2   the fair consideration section?
3       I think that we do have to change it.
4       (Pause)
5
6       (Continued on next page)

1       THE COURT: All right. I have some suggestions which
2   I think may -- I don't know if you've had a chance to read
3   through it. I've made some changes. The change I've made
4   really go to the definitions.
5       I think we need to have a definition after fair
6   consideration of in good faith, because that's not -- and so I
7   put the definition in Section 2. Act in good faith means to
8   act fairly, honestly, and openly, period. Under the first
9   definition of fair consideration that applies to Mr. Palermo's
10  conveyance of the $300,000 -- excuse me, to Mr. Palermo's
11  conveyance of the right -- I said conveyance of the property.
12  Under just conveyance of the property. I guess I should call
13  it other than the property.
14      MS. TUCKER: Funds?
15      THE COURT: Funds. All right. Maybe it should be
16  arranging, arranging the transfer of the funds.
17      MS. TUCKER: I'd agree.
18      THE COURT: Under the second definition of fair
19  consideration, it applies to Mr. Korff's receipt of the
20  $300,000, to secure an actual antecedent debt and services
21  theretofore provided, or previously provided, to be clearer to
22  the jury. I think that's how it has to be applied in view of
23  the definition of fair consideration.
24      MR. OBERDIER: Your Honor, just to make sure I
25  understood, so you will include the term "services," as well as

1   "antecedent debt" as it applied to Mr. Korff.
2       THE COURT: Yes.
3       MR. OBERDIER: We appreciate that.
4       We also will just ask your Honor to be careful about
5   not suggesting that it is undisputed or, even worse, that it is
6   an instruction from the Court that a transfer occurred from
7   Mr. Palermo to Mr. Korff, because as we discussed yesterday,
8   the actual transfer was for 455 Central Park West, and that is
9   an element of our defense. So alleged transfer, a transfer
10  that does not suggest it was directly from Mr. Korff.
11      THE COURT: All right. Alleged arrangement or alleged
12  transfers.
13      MR. OBERDIER: And also I believe the law requires
14  that if the allegation is that the transfer from Columbia or
15  455 Central Park West was somehow to be attributable to
16  Mr. Palermo, I believe the law requires that he have controlled
17  the transfer merely as opposed to arranged it. "Arranged it"
18  is a pretty loose word, and many things can be arranged even
19  though they weren't controlled.
20      THE COURT: "Control" has implications. "Control"
21  means more than one thing to a person.
22      MS. TUCKER: Your Honor, I think there should also
23  be -- with respect to good faith under No. 2 and Mr. Korff's
24  good faith, there should be a constructive knowledge of good
25  faith as we submitted in the charge --

10/28/2010 Trial Day 4 - Closing Arguments Verdict

1  trial references on the right side of the chart under
2  "Judgments," was that they were all outstanding and unpaid as
3  of July 29, 2004. And as you can see, between the judgments
4  and the tax debt, the total liabilities were at least $6.2
5  million.
6       Now, Mr. Oberdier said that we failed to put in any
7  evidence of any assets that Mr. Palermo had as of that date.
8  Well, it is hard to prove something that he doesn't have. And
9  in fact, he acknowledged that he didn't have sufficient assets
10 to satisfy his obligations of that date. In fact, at his trial
11 testimony at page 342 when he was asked as of July 29, 2004,
12 did you have the assets available to pay the Doubet debt which,
13 by his own admission, was approximately $3 million, he said no.
14 He was insolvent then, and he was insolvent long before that.
15      You also have to look at all of his bank statements.
16 Take a look at how many checks he bounced over the years from
17 the limited records that he made available to the trustee. The
18 bank statements, they are not in the binder but they can be
19 made available to you if you want to look at them. They are
20 Plaintiff Exhibits 3 through 8 and 11 through 17.
21      Now, if I can direct your attention back to Defendant
22 Exhibit T which, by Mr. Korff's own testimony was prepared at
23 his direction and he reviewed for accuracy and confirmed its
24 accuracy, you will look at the characterization of the $300,000
25 payment that was made to him on July 30, 2004. And that is on

669

10/28/2010 Trial Day 4 - Closing Arguments Verdict

1  line 34 of the chart. It says "300K payment funds transfer
2  from D. Palermo to Law Firm of JK."
3       Now, you heard Mr. Oberdier blame the bookkeeper. And
4  you also heard Mr. Oberdier point you to the wire transfer
5  confirmation that is in Defendant Exhibit B. And he pointed
6  out the fact that the wire transfer confirmation indicated that
7  the funds came from Bryan Cave, attorneys for somebody in the
8  transaction, to suggest that the moneys were actually being
9  paid by Bryan Cave's client, not Mr. Palermo.
10      Well, ask yourselves this? How did the bookkeeper
11 know to book it to Mr. Palermo's loan account unless Mr. Korff
12 told her the money came from Mr. Palermo?
13      Now, I would like to talk to you a little bit about
14 Mr. Korff's tax returns, and Mr. Oberdier's comments about the
15 characterization of the $93 million net operating loss.
16      I don't know about you, but what I took from
17 Mr. Korff's testimony was not so much a concern about the net
18 operating loss, but what wasn't on his tax return. Mr.
19 Oberdier called it nitpicking. He said that the trustee has
20 been nitpicking about the books. And I would ask you to take a
21 look at Schedule B of the tax return. I will let you know the
22 exhibit reference shortly -- Plaintiff Exhibit 74. It is not
23 in the book. I apologize for that, but it has been published
24 to you and you can have a look at it. Among other things
25 Mr. Korff declared $4 of interest from the Bank of New York.

670

10/28/2010 Trial Day 4 - Closing Arguments Verdict

1  He also declared $901,000 of interest income from the IRS, but
2  he did not record any interest on account of the so-called
3  loans that he claims he made to Mr. Palermo and which were paid
4  back as of July 30, 2004. He also didn't declare any fee
5  income as a result of the $300,000 payment to him. It is just
6  not in his tax return.
7       Now, you can either conclude from that that he omitted
8  to put it on his return, or you can conclude from it that
9  that's not what the $300,000 was, that the alleged oral
10 agreement between Mr. Palermo and Mr. Korff -- oral
11 agreements -- never were.
12      You also heard Mr. Oberdier talk a lot about good
13 faith. Well, I would ask you to consider the testimony you
14 heard from Mr. Palermo and Mr. Korff on a number of subjects.
15      Mr. Palermo said he and Mr. Korff were really good
16 friends going back 25 years. According to Mr. Korff, they were
17 business associates.
18      According to Mr. Palermo, Mr. Korff was very involved
19 with the Columbia transaction -- but Columbia didn't pay him
20 the fee, Mr. Palermo did.
21      Mr. Palermo testified that he still owes Mr. Korff the
22 moneys that were advanced to him. Mr. Korff testified that he
23 forgave the debts. First he said that there was an agreement.
24 Then he said there was an understanding. Then he said that
25 there was an understanding in his own mind.

671

10/28/2010 Trial Day 4 - Closing Arguments Verdict

1       The $300,000 that was paid on July 30, 2004 was
2  transferred for the purposes of avoiding Mr. Palermo's
3  creditors of which there was a long line, including the federal
4  government, the state of New Jersey and Doubet, the judgment
5  that Mr. Silver held and that were assigned to Doubet LLC, and
6  he didn't want to pay them. He received a $1.8 million fee on
7  July 30, 2004, and he didn't pay those obligations. Instead,
8  he paid Mr. Korff and paid himself.
9       Under the laws the Court will instruct you, that was a
10 fraudulent transfer. And I am confident that when you have an
11 opportunity to look at the testimony and the exhibits that have
12 been put before you, that you will conclude the transfer should
13 be avoided and returned to the estate so that Mr. Palermo's
14 creditors can be repaid, at least in part, for the obligation
15 that Mr. Palermo owed to him.
16      I would also like to point out that Mr. Palermo to
17 whom there is no dispute -- as far as we are concerned
18 anyway -- earned the fee and received the fee on July 30, 2004.
19 He was served, by his own testimony, on page 331 with the
20 restraining notices, and he caused the moneys to be transferred
21 to Mr. Korff.
22      I would like to thank you again for your time, and I
23 have taken up enough of it. So I think I would like to just
24 ask that you consider the evidence that has been put before you
25 and render a verdict in favor of the trustee.

672