UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
In re:

DOUGLAS E. PALERMO,

                      Debtor,                      **OPINION & ORDER**
----------------------------------------------------------X
DAVID R. KITTAY, TRUSTEE               08 CV 7421 (RPP)
                    Plaintiff,

          -against-

JOSEPH KORFF,

                    Defendant,
----------------------------------------------------------X
**ROBERT P. PATTERSON, JR., U.S.D.J.**


## I.  Introduction

On October 28, 2010, a jury returned a unanimous verdict awarding the Trustee, David Kittay ("Trustee" or "Plaintiff") $300,000 in damages from Defendant, Joseph Korff ("Korff" or "Defendant") for his receiving that sum in connection with a real estate sale (the "deal" or "transaction") by 455 Central Park West, LLC ("455 CPW") to Columbia University ("Columbia") on July 30, 2004, from an insolvent Debtor, Douglas Palermo ("Palermo" or "Debtor") without providing fair consideration. On November 4, 2010, the Defendant moved for reconsideration of the Court's determination, on the eve of trial, that the Plaintiff's Complaint ("Compl.") was timely filed. That motion for reconsideration was denied by this Court's Order and Opinion dated February 4, 2011.

On February 3, 2011, the Trustee moved this Court to determine the amount of attorneys' fees to be paid by Korff pursuant to New York Debtor-Creditor Law ("DCL") § 276-a and Fed.R.Civ.P. 54(d), and for an award of prejudgment interest pursuant to Fed.R.Civ.P. 59(e). ("Trustee Fees Mem."). The motion was accompanied by the Declaration of Lita Beth Wright,

Esq. ("Wright Fees Decl."). On February 17, 2011, this Court entered judgment for the Trustee in the amount of $477,090.41 including $177,090.41 in prejudgment interest. On February 18, 2011, the Defendant submitted its memorandum in opposition to the Trustee's motion for attorneys' fees ("Def. Fees Opp. Mem.") and the Declaration of Carl W. Oberdier, Esq. ("Oberdier Fees Decl."). On February 25, 2011 the Trustee submitted its reply memorandum ("Trustee Fees Reply Mem.") and accompanying declaration of Bonnie A. Tucker, Esq. ("Tucker Fees Decl.").

On March 18, 2011, the Defendant renewed his motion for a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), or in the alternative, for a new trial pursuant to Fed. R. Civ. P. 50(b) and 59(a). ("Def. JNOV Mem."). The Trustee submitted its memorandum of law in opposition to this motion on April 15, 2011. ("Trustee JNOV Opp. Mem."). Korff submitted his reply papers on May 3, 2011. ("Def. JNOV Reply Mem."). On May 17, 2011, the Trustee submitted the Supplemental Declaration of Lita Beth Wright, Esq. ("Supp.Wright Fees Decl.") in further support of its fees motion. This Declaration detailed the attorneys' fees and expenses incurred by the Trustee in responding to Defendant's papers since the time the Trustee's fee motion was fully submitted.

For the following reasons, the Defendant's motion for a judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), or for a new trial pursuant to Fed. R. Civ. P. 50(b) and 59(a), is denied and the Trustee's motion for attorneys' fees pursuant to DCL § 276-a and Fed. R. Civ. P. 54(d) is granted.

## II.  Background[1]

On October 14, 2005, the Debtor, Palermo, filed for bankruptcy. On October 12, 2007, the Trustee filed an adversary complaint naming Palermo, Korff, and others as Defendants in an action seeking to recover payments made to those individuals prior to Palermo's filing for bankruptcy but after his insolvency. (Compl. ¶ 46). The Bankruptcy Judge ordered the Trustee to file separate complaints, and on January 7, 2008, the Trustee filed the instant complaint in the United States Bankruptcy Court for the Southern District of New York seeking, pursuant to DCL § 273-76, to recover a $300,000 transfer to Korff dated July 30, 2004. (See Compl.) Korff filed an answer to the complaint through his then counsel, Cole Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz") on February 20, 2008. (Wright Fees. Decl. at Ex. J.)   On or about August 7, 2008, Korff moved to withdraw the reference from the Bankruptcy Court. (Id. at Ex. L.) On December 10, 2008, Judge Karas granted Korff's motion to withdraw the reference and directed that such withdrawal would take effect once discovery had been completed. (Id.) Judge Karas's grant of the motion was made "on the condition that no dispositive motions will be filed before trial." (Id.) Ten months later, on October 5, 2009, Korff's attorneys, Cole Schotz, moved to withdraw as his counsel. Cole Schotz's motion was granted on December 1, 2009. Over the next several months, Korff, formerly a practicing tax attorney, appeared *pro se* in this action. On July 20, 2010, Judge Karas ordered that a pre-trial order be filed on September 30, 2010. On September 28, 2010, by consent of both parties,[2] the deadline for the filing of the pre-trial order

---

[1] "Tr." refers to the trial transcript of Kittay v. Korff, 08 CV 7421, held before this Court between October 25 and October 28, 2010.

[2] By this time, Korff was being represented by Andrea Marcus, Esq. ("Marcus"), a lawyer employed by Korff's business entity, Arc Development LLC. Because Marcus never entered a notice of appearance in this case, it is unclear when she began working with Korff on this matter.  As of September 27, 2010, however, the Trustee had identified Marcus as Korff's counsel and sought her consent in their request for an extension of the deadline for filing the pre-trial order.

was extended to October 7, 2010. Prior to the deadline for submitting the joint pre-trial order, the case was reassigned to this Judge, who on October 1, 2010, set the trial date of October 25, 2010.

On the eve of trial, on October 19, 2010, Carl Oberdier ("Oberdier") of Schiff Hardin LLP ("Schiff Hardin") filed an appearance as additional counsel to represent Korff in this litigation. Between October 19, 2010 and the commencement of trial one week later, Korff's new counsel made multiple *in limine* motions requiring response by the Trustee. (Trustee Fees Mem. at 6.) The motions concerned the "adjournment of the trial; the purported collateral estoppel effect of a decision in another adversary proceeding [against a third party] related to the Debtor['s transfer of property]; the denial of [the] use … of the July 9, 2007 decision of [the Bankruptcy Judge] denying the Debtor a discharge [as evidence at trial]; the use of depositions taken in other adversary proceedings related to the Debtor [in this] trial; the Trustee's ability to offer his bookkeeper's lay opinion testimony at trial; the timeliness of the Trustee's 11 U.S.C. § 548 claim;…the authenticity, relevance and hearsay objections to nearly all of the Trustee's trial exhibits raised by Korff the day before trial began; the issuance of a trial subpoena by alternative process to the Debtor due to the Debtor's repeated attempts to evade service; and… the dismissal [of the case] on statute of limitation grounds." (Id. at 6-7.)

The trial was held from October 25, 2010 to October 28, 2010. Prior to the submission of the case to the jury, the Defendant moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. The Court denied the motion. (Tr. at 576.) Following the denial of Korff's motion, Plaintiff moved the Court for an order amending the complaint pursuant to Fed. R. Civ. P. 15 to add a claim for attorneys' fees pursuant to DCL § 276-a. On October 28, 2010, the Court granted Plaintiff's motion and submitted to the jury the issue of whether Korff had the actual intent to

defraud the Debtor's creditors. (Tr. at 700.) On October 28, 2010, the jury returned a verdict for

the Trustee on all claim including its claim under DCL § 276-a.

### III. Motion for a Judgment as a Matter of Law, or in the Alternative, for a New Trial

#### a. Legal Standards

##### i. Fed. R. Civ. P. 50(b)

The Court must set aside a verdict and enter judgment as a matter of law pursuant to Fed.

R. Civ. P. 50(b) when "(1) there is such a complete absence of evidence supporting the verdict

that the jury's finding could only have been the result of sheer surmise and conjecture, or (2)

there is such an overwhelming amount of evidence in favor of the movant that reasonable and

fair minded [persons] could not arrive at a verdict against [it]." Myers v. County of Orange, 157

F.3d 66, 73 (2d Cir. 1998) (citation omitted). When evaluating a Rule 50(b) motion, the

reviewing Court must view the evidence in "the light most favorite to the nonmovants." Sirota v.

Solitron Devices, Inc., 673 F.2d 566, 573 (2d Cir. 1982). "Credibility determinations, the

weighing of evidence and the drawing of legitimate inferences from the facts are jury functions,

not those of a judge." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986).  A party,

however, cannot raise a ground in the Rule 50(b) motion that it did not specifically raise in its

motion for a directed verdict at the close of evidence. Doctor's Assocs., Inc. v. Weible, 92 F.3d

108, 112 (2d Cir. 1996); see also Cruz v. Local Union No. 3 of Int'l Broth. of Elec. Workers, 34

F.3d 1148, 1155 (2d Cir. 1994) ("[J]udgment a matter of law is limited to those issues

specifically raised in [a] prior motion for a directed verdict.").

##### ii. Fed. R. Civ. P. 59(a)

In order to succeed on a motion for a new trial pursuant to Fed. R. Civ. P. 59(a), the

movant must show that the jury reached "a seriously erroneous result or…[that] the verdict is a

miscarriage of justice." <u>Manley v. AmBase Corp.</u>, 337 F.3d 237, 245 (2d Cir. 2003). Even a "trial judge's disagreement with [the] jury's verdict is not sufficient reason to grant a new trial." <u>Mallis v. Bankers Trust Co.</u>, 717 F.2d 683, 691 (2d Cir. 1983).

**b. Discussion**

The Defendant puts forth five arguments as to why he is entitled to a judgment as a matter of law pursuant to Fed. R.Civ. P. 50(b), or to a new trial pursuant to Fed. R. Civ. P. 50(b) and 59(a). Korff argues: 1) that he is entitled to judgment on the Trustee's claims pursuant to DCL §§ 273-275 because the jury could not have reasonably concluded that the $300,000 transfer lacked fair consideration and because "good faith" existed as a matter of law; 2) that he is entitled to judgment on the Trustee's claim pursuant to DCL § 276 because the jury could not have reasonably found that the Debtor, Palermo, had the actual intent to defraud his creditors; 3) that the Trustee is not entitled to an award of attorneys' fees under DCL § 276-a because the jury could not have reasonably found that Korff had the actual intent to defraud Palermo's creditors; 4) that Korff is entitled to judgment as an innocent creditor under DCL § 278; and 5) that Korff was entitled to "partial consideration" and "alter ego" instructions and that the Court's failure to give these instructions, and the Court's instruction on "constructive knowledge" were improper requiring a new trial.

These arguments will be addressed in turn.

    i. <u>Korff is Not Entitled to Judgment as a Matter of Law on the Trustee's Claims Pursuant to DCL §§ 273-75 because a Reasonable Jury Could Have Found that the Transfer Between Palermo and Korff Lacked Fair Consideration and Good Faith Did Not Exist as a Matter of Law</u>

A transfer may be avoided as constructively fraudulent under § 272 of the DCL if it is made without fair consideration *and*: "1) the debtor is [or will thereby be] 'rendered insolvent'

6

by the transfer, DCL § 273; 2) the debtor is left with unreasonably small capital for a pending or imminent business transaction, DCL § 274; or 3) the debtor intends or believes that he will incur debts beyond his ability to pay them as they mature, DCL § 275." <u>Liberty Mut. Ins. Co. v. Horizon Bus. Co. Inc.</u>, 2011 WL 1131098 at * 5 (E.D.N.Y Feb. 22, 2011) (internal citations omitted).

a.   *There was evidence from which the jury could reasonably conclude that Palermo was insolvent*

The evidence introduced at trial established that Palermo was insolvent well before July 29, 2004, the date of the 455 CPW closing. (Tr. 128-45, 338-42). Palermo testified on direct examination that at the time he filed for bankruptcy on October 14, 2005, he had $5,000 in personal property and over $2 million in liabilities to creditors holding unsecured priority claims. (<u>Id</u>.; <u>see</u> <u>also</u> Trust. Ex. 1.) Palermo also had over $6 million in liabilities to creditors holding unsecured non-priority claims. (Trust. Ex. 1.) Palermo's obligations included $832,000 to the IRS for taxes from 2001 through 2004 (tr. at 128-29, 338-40); $1,133,808 to the State of New Jersey for corporate withholding taxes prior to 2004 (<u>id</u>. at 129); $455,000 for a judgment entered prior to July 29, 2004 by 274 Water Street Corp (<u>id</u>. at 131); $363,068 for a judgment entered prior to July 29, 2004 by Dollar Dry Dock Savings Bank (<u>id</u>,. at 132); $310,000 for a judgment entered in 1989 by Key Borough Enterprises (<u>id</u>. at 144-45); $195,166 for two judgments entered prior to July 29, 2004 by MidAtlantic National Bank (<u>id</u>. at 137); $3,000,000 for judgments entered prior to July 29, 2004 by Morris P. Silver, LLC/Doubet (<u>id</u>. at 138, 227); $169,552 for a judgment entered in 1999 by Richard A. Flintoff (<u>id</u>. at 143); $347,558 for a judgment entered prior to July 29, 2004 by FDIC for Broadway Bank and Trust Co. (<u>id</u>. at 133); $189,136 for a judgment entered in 1988 by Paul Guyet (<u>id</u>. at 143-44); and $440,000 for a judgment entered in 1990 by Citibank (<u>id</u>. at 144.) (Trust. Ex. 83.)

Plaintiff's claims under DCL §§ 273-75 therefore depend on whether fair consideration was provided.

> ### b. *There was sufficient evidence for a reasonable jury to conclude that there was no fair consideration*

DCL § 272 defines fair consideration:

Fair consideration is given for property, or obligation

   a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

   b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

   DCL § 272

As the plain language indicates, the test for fair consideration comes down to two necessary elements: 1) a fair exchange of value between the transferee and transferor; and 2) good faith. Petersen v. Vallenzano, 849 F. Supp. 228, 231 (S.D.N.Y. 1994). Thus, even "where there is a fair exchange of value to satisfy an antecedent debt, the conveyance may be set aside if good faith is lacking." In re Dr. J. Herbert Fill, 82 B.R. 200, 216, (Bankr. S.D.N.Y. 1987). When determining whether there is a claim of fair consideration, or "fair exchange of value," for a conveyance, courts look to the particular facts of each case. Petersen, 849 F.Supp. at 231.

> ### *There was sufficient evidence at trial for a reasonable jury to conclude that BTI was an entity controlled by Palermo*

In his opening statement, Korff's counsel maintained that there was fair consideration for the $300,000 payment his client received because the money did not come from Palermo, but rather, from 455 CPW in exchange for the "essential advice and work that Mr. Korff did to make

that deal happen." (Tr. at 120-21.)[3] Similarly, Korff testified that he "was entitled, because of [his] participation in the transaction, for the benefit of Columbia and McLean, to an interest in the fees that were being paid out of the transaction" and that in order to secure getting that money he "had to give them—and did not get the money until [he] gave them on July 30th, 2004, a release; because without that release, [he] would have had a claim against them for potentially a larger share of the fee." (Id. at 409.)

The exhibits at trial showed that on August 28, 2001, Butterfield Trust I ("BTI") by David Buchanan ("Buchanan"), Trustee, and Beekman Street Advisory Corp. ("BSA") by Palermo, President, contracted to provide "strategic financial advisory services" to 455 CPW in connection with its sale of property located at 455 Central Park West, New York City to Columbia. (Trust. Ex. 45, Ex. 1.) The contract provided that BTI, would receive 3% of the total amount paid by Columbia to 455 CPW, and that BSA would receive 1%. (Id.) BSA was admittedly an entity wholly owned and controlled by Palermo. (Tr. at 226-27, 266). A reasonable jury could have concluded from the evidence that BTI was also controlled by Palermo. As admitted by Palermo, BTI was not a trust, but rather, an LLC created for the benefit of Palermo's children. (Id. at 170, 294-95.) Further, Palermo admitted that he had BTI set up, (id. at 170, 178), that BTI was created just to receive a portion of the strategic financial advisory services fee on the 455 CPW transaction even though it had not provided any services to 455 CPW or Columbia (id. at 225-26), that he and BSA provided the services to 455 CPW and Columbia, (id.), and that Korff acted as a consultant "on structure" to Palermo "not directly, but privately." (Id. at 224, 226.) He also testified that BTI's trustee, Buchanan, only helped structure the arrangement

---

[3] "In fact—and this is very, very important—Mr. Korff didn't get the $300,000 from Mr. Palermo at all. Instead Mr. Korff was paid that $300,000 fee as a broker's fee by a well established real estate company that owned a luxury highrise apartment building on Central Park West. That company's name was 455 Central Park West LLC, and the fee was paid when it sold 53 condominium luxury units to Columbia University." (Tr. at 120.)

between MCL companies and the entities (the "strategic financial advisory services" fee) and that Butterfield Trust did no work with bringing Columbia to the table to buy units of the building at 455 CPW or at the closing. (Id. at 170-71, 176-78.) He also testified that BTI received a fee because Palermo wanted to "segregate the payments." (Id. at 178.)

The Trustee also offered Palermo's prior testimony in which he admitted that the successor trustee of BTI could not make payments from that entity without Palermo's permission.[4]

On October 20, 2002, the "First Amendment" to the strategic advisory services contract reduced BTI and BSA's percentages to dollar figures—BTI to receive $1,361,640 and BSA to receive $313,880 in addition to the $140,000 it had previously received—for a total fee of $1,815,520, or 4% of the total purchase price. (Trust. Ex. 45.)[5]

On October 20, 2003, the "Second Amendment," provided that BTI's fee would be reduced by $300,000 and that this amount would be provided to Korff, a new party to the advisory fee agreement, who was not included in the collective definition of "Advisors" in the Second Amendment. (Trust. Ex. 50.) Furthermore, by letter dated July 29, 2004, 455 CPW agreed to "pay such amount directly to BTI (on behalf of the Advisors) or as BTI shall otherwise direct [455 CPW] in writing, at the time of the conveyance of the Pre-Sale Units to Columbia and the payment by Columbia of the purchase price." (Trust. Ex. 57.) From this change, a reasonable jury could conclude that Palermo had arranged that this $300,000 fee be deducted from the fee to be paid to the "trust" for his children and instead be paid to Korff. Moreover,

---

[4] "QUESTION: Did Mr. Chipman[, BTI's successor trustee at closing] have any authority without your instruction to take money out and spend it from Butterfield Trust?
ANSWER: No." (Tr. at 251.)
[5] The First Amendment was executed between 455 CPW, Daniel E. McLean of MCL Companies, BTI, BSA, N.M. Palermo, Inc., Residual Equity Corporation, and Douglas E. Palermo. All but 455 CPW and Daniel E. McLean were designated "collectively, the 'Advisors.'" (Trust. Ex. 45.)

from Palermo's testimony that he was the person who actually engaged in the work with Columbia and 455 CPW and that Korff "consulted with me not directly, but privately," (tr. at 226) a reasonable jury could conclude that Korff's claim that he was entitled to a fee from Columbia and/or 455 CPW (id. at 409) was false and that his claim was for services to Palermo not BTI.

> *There was sufficient evidence at trial for a reasonable jury to conclude that the $300,000 transfer was not provided from the funds due to be paid by 455 CPW or Columbia*

First, the reduction of BTI's fee in the Second Amendment by $300,000, and the provision that the $300,000 be paid to Korff, strongly implies that the "trust" for Palermo's children gave its right to that sum to Korff.

Second, prior to the Second Amendment, in February of 2003, Doubet, one of Palermo's largest judgment creditors, served a restraining notice of $2,537,436.81 on Palermo, 455 CPW, Columbia, and other parties to the transaction. (Tr. 227-28, 281, 293, Trust. Ex. 44.) At the 455 CPW closing, two additional documents—a letter agreement and a release—were executed by the parties. (Trust. Ex. 57, Def. Ex. H.) The July 29, 2004 letter agreement affirmed that Columbia had no responsibility for the payment of any fees in connection with the transaction. (Trust. Ex. 57.) By the July 29, 2004 release, BTI, BSA, N.M. Palermo, Inc., Residual Equity Corporation, Palermo, the Law Firm of Joseph Korff, and PMD Company, in consideration of the payments of fees by 455 CPW to BTI, the Law Firm of Joseph Korff, PMD Company, and the MCL Companies, released Columbia and 455 CPW from any and all causes of action arising out of or in any way connected with 455 Central Park West, New York, NY. (Def. Ex. H.)

The jury had other grounds to believe the defense on opening was misleading about Palermo's role in BTI and the reasons for the $300,000 payment to Korff on July 30, 2004.

11

Palermo maintained that Buchanan was an independent person who managed BTI but admitted he was equally interested.

> QUESTION: Who instructed [Mr. Buchanan] to negotiate?
>
> ANSWER: He was an independent person.
>
> ***
>
> QUESTION: What services did Butterfield Trust provide to the transaction?
>
> ANSWER: It helped structure the arrangement between MCL companies and the entities.
>
> QUESTION: On behalf of Butterfield Trust who performed those services?
>
> ANSWER: David Buchanan.
>
> THE COURT: What part of the transaction did he provide structure?
>
> THE WITNESS: The advisory service agreement, your Honor…he also negotiated with MCLs to what the structure of the payment would be.
>
> THE COURT: Just the structure of the payment?
>
> THE WITNESS: Mr. Buchanan was in my office for two years. He worked with me on an ongoing basis on many matters.
>
> BY MS. TUCKER:
>
> QUESTION: Did you have any involvement in the negotiation of the payment?
>
> ANSWER: Yes.
>
> QUESTION: What was your involvement?
>
> ANSWER: The same as Butterfield Trust.
>
> ***
>
> QUESTION: Did you receive a W-2 or a 1099 from Butterfield Trust?
>
> ANSWER: I think I did, yes

(Id. at 171-72.)

\*\*\*

Plaintiff's counsel then showed Palermo page 91, lines 19-22 of the transcript of his

deposition on March 14, 2007.

> QUESTION: …[D]oes this refresh your recollection as to the work Butterfield Trust
> performed with respect to Columbia University and the 455 Central Park West
> transaction?
>
> ANSWER: I think your question was something else. You asked did Butterfield Trust do
> any work in relation to the fee agreement I think was your question—or was my
> answer—not in relationship to the body of work with Columbia University, but it ran to
> the agreement.
>
> THE COURT: So Butterfield Trust did no work in connection–
>
> THE WITNESS: That's correct.
>
> THE COURT:  –with the bringing of Columbia University to the table–
>
> THE WITNESS: That's correct, your Honor.
>
> (Id. at 176-77.)

\*\*\*

> BY MS. TUCKER:
>
> QUESTION: The companies at the top, did Butterfield Trust perform any services to
> Columbia or the closing after the agreement was signed?
>
> ANSWER: No.
>
> (Id. at 178.)

Since Palermo testified that he was the person who actually engaged in the work with

Columbia and 455 CPW, and that Korff only consulted with him privately, (id. at 226), a

reasonable jury could conclude from this evidence that the $300,000 transfer was a deduction

from the "strategic financial advisory fee" to which the preceding agreements had agreed was to

be paid to BTI, an entity controlled by Palermo, that Palermo had performed the advisory

services and directed that payment for his services be directed to BTI, a company he set up and controlled, and that the $300,000 was not paid to Korff for his services to Columbia or 455 CPW, as Korff's counsel had asserted in opening to the jury and as Korff stated in his testimony.[6] (Id. at 120-21.)

Third, Korff's own consolidated version of his payments to and receipts from Palermo corroborated that the $300,000 payment was "received from Palermo." (Def. Ex. T.) No bills for legal or other services by Korff were offered in evidence nor was any contemporary correspondence or documentary evidence showing a change in the structure of the deal offered by Korff to corroborate his claim that the $300,000, or any part of it, was owed to him by 455 CPW or Columbia for advice or services. Indeed, the Trustee also introduced testimony from a 2006 deposition in which Korff testified that he negotiated the $300,000 as "an assignment of fees that were labeled to go to [the Debtor] directly," (tr. at 492) indicating he was aware that Palermo controlled BTI and that the transfer was being directed to him by Palermo.

Finally, Korff confirmed in his testimony that he gave advisory services to Palermo, that Palermo had suggested Columbia offer to buy condominium units at 455 CPW, that Korff suggested Columbia finance the purchase with tax exempt dormitory financing at low interest (tr at 388), and that his relationship with Palermo was "let's see what is going to happen and then we will figure it out...as to how we wo[u]ld share any fee that ultimately evolved." (Id. at 389, 391.)

Accordingly, the jury had documentary and other evidence that indicated that the $300,000 was received from fees Palermo had rendered the parties and had fair reason to conclude that Korff was untruthful when he testified that the $300,000 transfer came from 455

---

[6] A reasonable jury would also be aware that advisory services on a real estate transaction are contingent and paid by the buyer or seller at closing.

CPW or Columbia in payment for services Korff had performed for them in connection with the transaction.[7] Given that Palermo and Korff did not provide consistent explanations for the transfer, and there were no contemporaneous records or notes documenting any basis for Korff's claim he received his fee from 455 CPW or Columbia, the jury was entitled to conclude that Korff's claim was untrue and that Palermo's statement as to the value of Korff's services was highly inflated.

### *A reasonable jury could also conclude that the $300,000 transfer to Korff was not in repayment for antecedent debts owed by Palermo*

Korff's other position—that the payment of the $300,000 was in repayment of personal loans by him to Palermo—was also not confirmed by documentary evidence other than the canceled checks payable to Palermo or Palermo entities from Korff's attorney account or from other business entity accounts controlled by Korff. (Def. Ex. B.) Korff provided no note from Palermo reflecting the amounts due from Palermo or by his entities. Nor were records of Palermo or his business entities presented to confirm that the "loans" were reflected as amounts due to Korff.

While fair consideration can be found where the conveyance is in exchange for "the satisfaction of antecedent debt for reasonably equivalent value and good faith," Sklaroff v. Rosenberg, 125 F.Supp. 2d 67, 73 (S.D.N.Y. 2000), courts in this District have found that payments for undocumented or disproportionate loans do not constitute fair consideration. Id. (avoiding transfer on summary judgment and holding that the "payment of $855,000 to release a

---

[7] When questioned about a proposed September 22, 2003 assignment to Korff in the amount of $175,000, Palermo asserted that Korff had contributed $175,000 worth of value to the project and "[w]hatever he did was worth every penny." (Tr. at 347.) When asked about the increase between the $175,000 due to Korff in the September 22, 2003 draft agreement and $300,000 due to Korff in the October 20, 2003 Second Amendment, Palermo testified that the increase was because Korff "put more work in, I'm sure." (Id. at 347, Trust Ex. 48). When questioned about the substantial increase in the fee over such a short amount of time, Palermo stated that counsel was "absolutely clueless" as to the work it took to complete such a "monumental task." (Tr. at 347-48.) Palermo did not specifically describe the nature of the "monumental task" Korff rendered or the nature of the services Korff allegedly provided. It is undisputed that Korff rendered no bill for his services.

$4,300,000 loan is not, by any calculus, fair consideration."); Petersen, 849 F.Supp. at 231-32

(finding that fair consideration did not exist where there was no evidence to "indicate the amount

of the debt, the amount by which the alleged debt was reduced, or even how such debt may have

been incurred in the first place."). Further, while the burden of proof in establishing that a

transfer was made without fair consideration generally rests with the party challenging the

transfer, "where the evidentiary facts as to the nature and value of the consideration are within

the transferee's control, the burden of coming forward with evidence on the fairness of the

considerations shifts to the transferee." ACLI Gov't Sec., Inc. v. Rhoades, 653 F.Supp. 1388,

1391 (S.D.N.Y. 1987). Here, all records regarding the value and nature of any consideration

given by Korff to Palermo were within Korff's control.[8] As such, the burden shifted to the

Defense to show at trial that the $300,000 transfer from Palermo to Korff was supported by fair

consideration. (Id.)

    Korff argues that since there was "dispositive evidence" that he gave fair consideration in

exchange for the $300,000 transfer he received from Palermo, he is entitled to judgment on the

---

[8] Oberdier, Korff's attorney, incorrectly interprets U.S. v. McCombs, 30 F.3d 310, 323-24 (2d Cir. 1994) as "slam[ming] the door shut on Plaintiff's attempt to shift the burden of proof of fair consideration." (Def. JNOV Reply Mem. at 3-4.) Rather the Second Circuit held in McCombs that "where the only issue under section 273 is whether the consideration given constituted 'fair' consideration *relative to the fair market value of the Property*, as opposed to disputes over the specific nature or value of the consideration itself…the burden for establishing unfair consideration under section 273 [remains] with the party asserting the fraudulent conveyance claim." (emphasis in original). The issue in the instant case, unlike the case in McCombs, is not whether the consideration was fair relative to the fair market value of real property, but rather, whether the consideration was fair in itself. To this issue, the court in McCombs cites to ACLI and notes that there is "some authority under New York law, however, for the view that 'where the evidentiary facts *as to the nature and value of the consideration* are within the transferee's control, the burden of coming forward with evidence on the fairness of the consideration shifts to the transferee[,]' ACLI Gov't Sec. v. Rhoades, 653 F.Supp. 1388, 1391 (S.D.N.Y. 1987) (emphasis in original), 'and the [burden of proving the] fairness of the consideration therefor, should be cast upon the transferees.'" Gelbard v. Esses, 96 A.D.2d 573, 576 (2d Dep't 1983). Here, Korff claimed that all entries on his books as an attorney, and entries on the books of his business entity, Arc Development LLC, dating back as far as 1996, whether made to Palermo or entities controlled by Palermo, were loans to Palermo that provided fair consideration for the $300,000 transfer. Because these records were under Korff's exclusive control and possession, the burden of proving fair consideration thus shifts to Korff, as the transferee, pursuant to ACLI. This, however, did not change the fact that the Trustee had the burden to prove each element of each of his claims. The jury was instructed that the Trustee had to prove each element of each of the first three claims, DCL §§ 273-75, by a preponderance of the evidence and to prove each element of DCL § 276 by clear and convincing evidence. (Tr. at 684.)

16

Trustee's claims under DCL §§ 273-275. (Def. JNOV Mem. at 9.) This "dispositive evidence," however, did not include Korff's business records. Korff did not produce the underlying records, but rather, utilized a "summary exhibit of his loans to [Palermo]…[that Korff asserts] was faithfully drawn from…[his] actual checks and wire transfers, a few of which were labeled '*advances*.'" (Def. JNOV Reply Mem. at 1.) Korff then cites <u>Nay v. Curley</u>, 113 N.Y. 575 (1889) and argues that because "New York *presumes* that checks and wire transfers are loans where the payee…admits that such transfers were not payments of preexisting debts owed to him," he has met his burden of proving that the July 30, 2004 transfer of $300,000 was supported by fair consideration. (<u>Id</u>. at 2.)

First, <u>Nay</u> does not support the Defendant's position because the payee of these "advances," Palermo, was not confronted at trial with the checks Korff testified were loans to Palermo, and did not admit that such transfers were not payments of preexisting debts owed to Palermo or his business entities or real estate ventures. Nor did Korff's counsel ask Palermo to give any specific explanation of the various checks claimed by Korff to be loans.

However, on the second day of trial, Palermo testified that he had borrowed sums from Korff over the years and that Norfolk Financial, LLC had repaid Korff about $300,000 for loans Korff had made to Palermo or his business entities over the years, and that Norfolk Financial still owed Korff $42,500. (Tr. at 219-20.) The terms of the loan were at the "highest interest rate" (<u>id</u>. at 220) and the note was "open-ended" (<u>id</u>.). Furthermore, the Trustee elicited from Palermo that BTI transferred $901,000 of its portion of the advisory service fee, a sum sufficient to repay the $300,000 debt to Korff, to Norfolk Financial right after the July 29, 2004 closing of the 455 CPW sale. (<u>Id</u>. at 184-85.)

> QUESTION: … did Butterfield Trust perform any services to Columbia or the closing after the agreement was signed?

17

ANSWER: No.[9]

QUESTION: Why was it receiving a fee?

ANSWER: Because we wanted to segregate the payments.

QUESTION: Who is "we"?

ANSWER: Myself.

QUESTION: Just yourself?

ANSWER: Yeah.

(Id. at 178.)

***

QUESTION: At the closing, did money go into the Butterfield Trust?

ANSWER: Yes.

QUESTION: How much?

ANSWER: I don't recall the exact amount, but it was substantial.

QUESTION: Approximately $900,000?

ANSWER: Give or take.

QUESTION: What was the money used for?

ANSWER: I don't have a complete breakdown, but I have a schedule someplace.

QUESTION: What is Norfolk Financial LLC?

ANSWER: It's an operating company

QUESTION: Whose operating company?

ANSWER: Mine.

---

[9] Palermo later confirmed this testimony on his second day on the stand.
"QUESTION: But Butterfield Trust provided those services?
ANSWER: That's not what I said yesterday in my testimony. I said they did not."
(Tr. at 225.)

(Id. at 178-79.)

***

QUESTION: Was it formed in approximately July of 2004?

ANSWER: Could be.

(Id. at 179.)

***

QUESTION: Mr. Palermo, do you recall Norfolk Financial receiving funds from Butterfield Trust after the closing?

ANSWER: Yes.

QUESTION: How much did it receive?

ANSWER: I don't recall the exact amount.

QUESTION: It received all of the funds Butterfield Trust obtained at the closing, didn't it?

ANSWER: No, it didn't.

(Id.)

***

QUESTION: Mr. Palermo, of the money that Butterfield Trust received under the advisory services agreement amendment, how much of that money remained in the Butterfield Trust account?

ANSWER: I don't recall specifically.

QUESTION: Was any of that money distributed into the children's trust accounts you mentioned earlier?

ANSWER: No.

QUESTION: Where did that money go?

ANSWER: It went to Norfolk Financial.

(Id. at 184.)

Trustee's counsel then directed Palermo's attention to Trustee's Exhibit 60, Palermo's March 16, 2006 deposition transcript, page 32, lines 16 though 22 and asked if that refreshed his recollection as to the amount of money transferred from BTI to Norfolk Financial. When the witness did not give a number (id. at 185), Trustee's counsel directed Palermo to page 35 lines 6 though 8 to refresh his recollection.

> QUESTION: I direct your attention to page 35, lines 6 though 8. Does this refresh your recollection as to the amount of money that was paid from Butterfield Trust to Norfolk Financial?
>
> ANSWER: Not really.
>
> QUESTION: At the deposition you were asked the question:
>
> "QUESTION: And the full $901,000 was paid out of [sic] the Norfolk Financial bank account?
>
> ANSWER: Yes."
>
> (Id. at 185.)

The witness responded to this line of questioning by stating, "[y]ou have the bank statement. The bank statements tell you exactly what was paid out." (Id.)

> THE COURT: Is that the only –
>
> THE WITNESS: Your Honor, that's my recollection.
>
> THE COURT: – business entities that loaned money – owed money to Mr. Korff.
>
> THE WITNESS: No, I owed him personally.
>
> BY MS. TUCKER
> QUESTION: But earlier you walked into the courtroom and said you didn't owe Mr. Korff any personal money; that your entities owed Mr. Korff money.
>
> ANSWER: No. What I said was that I had owed Mr. Korff money that I had paid him, OK.
>
> QUESTION: And how much money did you owe Mr. Korff that you paid him?

ANSWER: About $300,000.

QUESTION: And who paid that $300,000?

ANSWER: Norfolk Financial. But what I said, the 42 was the residual amount that was left. There was money after I paid. I owed him 300-some-thousand dollars. I paid him the 300-some-thousand dollars, and it was forty-two-five left, which still stands.

QUESTION: So if I understand you, Doug Palermo, personally, owed Mr. Korff $300,000 and Norfolk Financial paid that money?

ANSWER: No. Doug Palermo didn't owe him $300,000. Norfolk owed him $300.000.[10]

QUESTION: Why did Norfolk owe Mr. Korff $300,000?

ANSWER: Because it borrowed it from him.

QUESTION: When did it borrow it from him?

ANSWER: I don't know the specific year, but it was over a long period of time.

QUESTION: Beginning when?

ANSWER: I said I don't remember the specific year.

QUESTION: Was it prior to July 29, 2004?

ANSWER: Did you hear what I just said? I don't remember the specific years.

QUESTION: Do you remember the terms of the loan?

ANSWER: It was the highest interest rate.

QUESTION: And how long did you have to pay back the money?

ANSWER: It was an ongoing, open-ended note. I mean it was – it was whenever I had the money I could pay it back.

QUESTION: And when was interest set to accrue?

---

[10] On this point, Korff later testified: "My testimony is that I was pursuing a variety of different transactions. When Mr. Palermo would provide financing sources for real estate transactions that I have had separate entities dealing with, whether because they're partnerships with other people or because they are family-owned, those entities would have been responsible for the fee, if any, that Mr. Palermo would have earned had a transaction he suggested closed." (Tr. at 407-09.) The evidence indicated throughout that as real estate operators operating through business entities, the parties contracted with various real estate entities formed to invest in and hold and operate real estate.

ANSWER: From the day I got the money. But it was incremental. I never got it all at once.

QUESTION: And why did you go to Mr. Korff for money?

ANSWER: Well, he's a friend of mine for 25 years, and we've done business together. And when I needed it he was able to provide it.

(Id. at 218-20.)

 The Trustee also successfully elicited a prior statement from Korff which contradicted

his testimony at trial that in return for the $300,000, he had released Palermo from his

outstanding debts. On October 27, 2010, Korff testified as follows.

QUESTION: As of July 30th, 2004, you had released all claims you had against Mr. Palermo and his entities for the advances you had made to him prior to that date and the interest that you assert accrued on it; correct?

ANSWER: That specific discussion never occurred. I will tell you that in my own mind I didn't expect to be pursuing him for anything before. We also never had a discussion with regard to the general services that I provided both to him and his entities over the years. And I can't say with regard to all claims, because we were still pursuing various transactions which, had they happened, would have given rise to additional rights that I would have had.

THE COURT: Well, now, let me just – the release that you executed was not to Mr. Palermo; is that right?

THE WITNESS: I don't recollect it. I don't have it in front of me. I don't recollect giving Mr. Palermo a release.

(Id. at 411.)

Korff then testified that he had an oral understanding with Palermo that he would no

longer pursue Mr. Palermo on the amount he had advanced to him and interest on the advances.

(Id. at 412.)

QUESTION: When did you reach that understanding with Mr. Palermo?

ANSWER: …I guess I have to alter that testimony, because I have some vague recollection of negotiating with him, and I don't remember the circumstances, for some

additional sum. And I think he signed an agreement to that effect. It may have been 330 versus 300. Again, from a state-of-mind basis, my state of mind, I wasn't intending to chase him for the spread.

(Id. at 413.)

\*\*\*

QUESTION: Ok. And the 300 you obtained from Columbia/McLean satisfied obligations relating to the advances, interest, and fees for services provided in connection with the 455 CPW transaction; correct?

ANSWER: Yes, essentially.

QUESTION: And since you regarded those obligations, the indebtedness and the interest, satisfied as of that date, you had no intention of pursuing him for those amounts after that date; correct?

ANSWER: That's correct.

(Id. at 418.)

The Trustee then introduced as an admission, Korff's 2006 deposition testimony where

he identified Palermo's debts as still due and owing.

QUESTION: How much money are you presently [as of 2006] still owed by Doug Palermo under these oral agreements?

ANSWER: Let's put it in the following frame of reference, a *quantum meruit basis*: I am entitled to be compensated for all of the advances over the years…I am entitled to be compensated for cash advanced to his various entities and to him.

(Id. at 420-21.)

Coupled together, the testimony from both Palermo and Korff as to the terms of the loan

by Korff (id. at 218-20, 413, 418-21) could lead a reasonable jury to conclude that since Korff

was not listed as a creditor of Palermo's (id. at 147), the debts Palermo had owed Korff over the

years had been satisfied by a $300,000 payment to Korff from Norfolk Financial sometime after

the closing. A jury could have further concluded that because Palermo admitted his outstanding

debt to Korff was in the range of $42,500 (id. at 218-20), the July 30, 2004 transfer of $300,000

23

to Korff from BTI negotiated in October 20, 2003 was not in repayment of Korff's loans to Palermo. Since there were no contemporaneous written agreements or notes documenting either the nature or extent of Korff's services to 455 CPW or Columbia, it was reasonable for the jury to conclude that Korff's explanations for the transfer were untrue, that Palermo's testimony concerning the value of Korff's services to the transaction was high inflated, and that there was no fair consideration provided for the $300,000 transfer from BTI.

*A reasonable jury could have concluded that Korff did not act in good faith as a matter of law*

Korff further argues that because he "provided fair value for the transfer, he acted in good faith as matter of law." (Def. JNOV Mem. at 10.) While it is true that a "transfer for [an] antecedent debt [is] deemed to be in good faith as a matter of law, unless such payments are to insiders," there existed, at trial, a genuine issue of fact as to whether any antecedent debt existed at all, and if so, in what amount, and as to whether BTI, BSA, and Korff, because of his ongoing business relationship with Palermo for over 25 years, were Palermo's insiders. (Id. (citing In re Sharp Int'l Corp. v. State Street Bank & Trust., 403 F.3d 43, 54 (2d Cir. 2005) (satisfaction of antecedent debt constitutes fair consideration without regard to transferee's knowledge or intent, unless the transferee is an insider or has expressly confessed his bad faith.))).  A reasonable jury could have found that the $300,000 transfer was not supported by fair consideration because Palermo's debts to Korff as of July 30, 2004 were actually extinguished with the $300,000 transfer from Norfolk Financial. The fact that Korff was not listed as a creditor in Palermo's 2005 bankruptcy  further supports the conclusion that Palermo's antecedent debts to Korff had been repaid. (Tr. at 147.) There was sufficient evidence for a jury to come to this conclusion and, as such, Korff has not shown good faith as a matter of law.

ii.  Jury's Finding of Actual Fraud under DCL § 276 is Supported by the Evidence

Next, the Defendant argues that he is entitled to judgment on the Trustee's claim for

intentional fraudulent conveyance because the Trustee was required to prove that Palermo had

the "actual intent to defraud," United States v. McCombs, 30 F.3d 310, 323-24 (2d Cir. 1994),

and the Trustee failed to offer any evidence on this issue with respect to the October 20, 2003

Second Amendment specifically. (Def. JNOV Mem. at 12.)

First, it should be clarified that while the Trustee may prevail on a DCL § 276 claim by

showing that the Debtor had the "actual intent to defraud," this is not the only way to succeed in

this type of action. DCL § 276 states:

> Every conveyance made and every obligation incurred with actual intent, as
> distinguished from intent presumed in law, to hinder, delay *or* defraud either
> present or future creditors, is fraudulent as to both present and future creditors.

(emphasis added).

The plain language of the DCL §276 itself indicates that the Trustee was required to

show that Palermo acted with the actual intent to *either* "hinder, delay, or defraud" his present

and future creditors in order to succeed on this claim.

Although actual intent "must be proven by clear and convincing evidence, …[it] may be

*inferred* [under § 276] from the relationship among the parties to the transaction and the secrecy

of the sale, or from inadequacy of consideration and hasty, unusual transactions." McCombs, 30

F.3d at 328. (internal citation omitted) (emphasis added). Because actual intent is "rarely, if ever,

established by direct evidence[,]" Hassett v. Goetzmann, 10 F.Supp.2d 181, 187-88 (N.D.N.Y.

1998), the intent may be inferred from the circumstances of the transaction and by proof "of

certain 'objective facts' – 'badges of fraud' – that give rise to an inference of intent to defraud."

Lippe v. Bairno Corp., 249 F.Supp.2d 357, 374 (S.D.N.Y. 2003). In its charge the Court

instructed the jury to consider the application of these "badges of fraud" which include: 1) gross inadequacy of consideration; 2) a close relationship between transferor and transferee; 3) the transferor's insolvency as a result of the conveyance; 4) questionable transfer not in the ordinary course of business; 5) secrecy in the transfer; and 6) retention of control of the property by the transferor after the conveyance. Id. at 375. "Depending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference." MFS/Sun Life Trust-High Yield Services v. Van Dusen Airport Services Co., 910 F.Supp 913, 935 (S.D.N.Y. 1995). Of the six badges of fraud discussed in Lippe, at least five are present in this case.

### Gross Inadequacy of Consideration

As discussed above, a reasonable jury could have concluded from: 1) the lack of any receipt or bill for services from Korff to 455 CPW or Columbia for all or any part of the July 30, 2004 transfer of $300,000; 2) the fact that Korff's services to Palermo was little more than advice to get Columbia to buy the condominium units with tax exempt financing and there was no documentary or testimonial evidence showing that anything more was performed by Korff; and 3) the fact that Norfolk Financial paid $300,000 to Korff for Palermo's outstanding loans, that Korff provided no fair consideration for the $300,000 transfer on July 30, 2004.

### Close Relationship Between Transferor and Transferee

The second badge of fraud stems from a close relationship between the transferor and transferee. While this badge "typically" involves "family relationships," Lippe, 294 F.Supp. 2d. at 382, that is not the only type of relationship which suggests a fraudulent intent to defraud. In this instance, Palermo's testimony on direct examination, repeated in substance a number of times by both Korff and Palermo, was that Korff has been "a friend of [his] for 25 years" and

that the two have often "done business together." (Tr. at 220.) When Palermo was asked about the parties' failure to memorialize their alleged loan agreement, he explained that it was unnecessary because it was a "friendship arrangement, just an understanding between parties." (Id. at 221.) When Korff was asked to identify any other person with whom he had such an arrangement, he was unable to do so and testified that the only other people he had such an "understanding" with were unidentified family or friends. (Id. at 392.)

Moreover, Palermo's advisory services agreements bespeaks fraud on creditors. Palermo testified that he performed the advisory services and that BTI provided no services but received the rights to three quarters of the fee for his services, that BSA, a company which Palermo owned and controlled, (id. at 226-27, 266), received the rights to the other quarter. (Trust. Ex. 45.) All these companies were ostensible third parties not identified with Palermo. There was a lack of evidence showing that any of these entities provided any consideration for the fee awarded to them.[11] Then, in the Second, and final, Amendment, Korff, Palermo's long-time friend and past and future business associate, was designated as the recipient of $300,000 that had previously been due to BTI. After payments were made, BTI then transferred $901,000 to Norfolk Financial, another Palermo insider, which used it to repay Korff's loans to Palermo.

*Transferor's Insolvency as a Result of the Conveyance*

Evidence presented by the Trustee demonstrated that the Debtor was insolvent both before and after the date of the $300,000 transfer. (Tr. 128-45; 338-342, Trust. Ex. 83.) Palermo had numerous unpaid creditors with liabilities totaling over $6,000,000. (Trust. Ex. 83.) Korff argues that the proper question is "whether the Transfer *worsened* the Debtor's already desperate financial condition," (Def. JNOV Reply Mem. at 7), and based on the evidence and testimony

---

[11] In fact, with respect to BTI, Palermo stated that reason it was receiving a fee was "because we wanted to segregate the payments." (Tr. at 178.) When asked to identify who "we" was, Palermo stated "myself." (Id.)

presented at trial, a reasonable jury could have concluded that the payment of an agreed upon fee of $1,655,520[12] to BTI, BSA, and Korff in connection with the 455 CPW transaction, instead of making payments to his priority creditors, did in fact worsen the Debtor's financial condition.

*Questionable Transfer Not in the Usual Course of Business*

From the testimony presented at trial, a reasonable jury could have concluded that the "usual course of business" between Korff and Palermo involved: 1) Korff loaning Palermo sums of money from time to time; 2) Korff, or his entity Arc Development LLC, making investments with one of Palermo's business entities—BSA, Argus Asset Management LLC, N.M. Palermo Inc., and Norfolk Financial LLC; or 3) Korff paying Palermo for a joint interest in prospective deals or introductions to deals and prospective investors. If these payments to Palermo were loans it would be the usual business practice for Palermo to have repaid the loans directly to the entity that provided them to him or to notify Korff in writing that the transfer of $300,000 was in "full repayment for all outstanding loans," or for Korff to provide a receipt to that effect. As such, it would be reasonable for a jury to find that the transfer of $300,000 from BTI's fee to Korff was outside the "usual course of business."

*Secrecy in the Transfer*

While the Trustee did not argue that the October 20, 2003 Second Agreement was secret, the testimony of both Palermo and Korff indicates that the advances allegedly providing fair consideration for this deal were not public and the payees were insiders but ostensibly third parties. None of the loans that Korff allegedly made to Palermo were documented by any notes or agreement. (Tr. at 381, 385.) Further, no entry on Korff's 2004 joint tax return documented

---

[12] While the First Amendment indicated that BTI and BSA would receive a total fee of $1,815,520 (Trust. Ex. 45), of which $300,000 was transferred to Korff, the July 30, 2004 release (Def. Ex. H) indicates that at closing, $90,000 was paid to PMD Company and $70,000 to MCL Companies in consideration for the release.

any income from the transfer, even though under Korff' rationales for the payment of $300,000,

the fee allegedly earned by Korff and any interest on the payment of the "loans" should have

been reported as income.[13] (Id. at 423-45, 452-61, Trust. Ex. 74.) The lack of documentation

formalizing any loan agreement between the parties, or any fee agreement at all, and the

contradiction between Korff's testimony at trial and his tax returns, could have also led a

reasonable jury to conclude that there was secrecy surrounding this transfer such that this badge

would also indicate actual intent by Palermo to hinder, delay, or defraud his creditors.

On this record, a reasonable jury could have weighed the evidence regarding these five

badges and concluded that the Trustee had proven its claim under DCL § 276 by showing, by

clear and convincing evidence, that Palermo had actual fraudulent intent. As such, Korff's

arguments for relief on this ground are also denied.

iii. The Trustee is Entitled to an Award of Attorneys' Fees under DCL § 276-a because the Jury could have Reasonably Found that Korff had the Actual Intent to Defraud the Debtor's Creditors

Korff also argues that the Trustee is not entitled to an award of attorneys' fees under DCL

276-a because there was "no basis on which a reasonable jury could have found that Mr. Korff

had [an] actual intent to delay, hinder or defraud the Debtor's creditors." (Def. JNOV Mem. at

18.)  Section 276-a states that attorneys' fees should be awarded when a conveyance "is found to

have been made by the debtor and received by the transferee with actual intent, as distinguished

from intent presumed in law, to hinder, delay or defraud either present or future creditors."

Under Second Circuit case law, DCL § 276-a attorneys' fees "may not be awarded against a

defendant, who is a grantee of a fraudulent conveyance, without a specific finding that he was

---

[13] This interest rate differs whether the loan is made to an individual or an entity. Korff testified that "advances to Palermo and his companies were joint and several obligations" (tr. at 434-35) and that he and Palermo agreed, from the outset, that an interest rate of 25%, the "maximum rate applicable at law" (id. at 381, 392) would apply on all loans to Palermo or any of Palermo's business entities. (id. at 434-35.)

aware of and participated in the actual fraud." <u>Carey v. Crescenzi</u>, 923 F.2d 18, 20 (2d Cir. 1991). It is for this precise reason that when the Trustee added a request for attorney's fees, Question No. 5 was added to the Verdict Sheet. This question asked the jury: "If you found, in connection with the last cause of action, that Mr. Palermo had actual intent to defraud his creditors, do you find that Mr. Korff also had actual intent to defraud Mr. Palermo's creditors?" The jury unanimously answered this question "Yes." (Tr. at 711.) A jury could have reasonably come to this conclusion based on Palermo's testimony that Korff knew, in advance of the July 29, 2004 closing, that the Debtor was unable to pay his debts as they came due, (<u>id</u>. 332), and based on the fact that Korff's exhibits demonstrate that he was made aware that many of the checks Palermo paid to Korff failed to clear. (Def. Ex. A, T.)

The jury could have reasonably concluded from its examination of the badges of fraud in connection with its finding of Palermo's fraudulent intent, that those badges applied in the case of Korff and demonstrated his intent to defraud Palermo's creditors as well.  Because the jury unanimously, and reasonably, found that Korff had the actual intent to defraud Palermo's creditors, the Trustee is entitled to an award of attorneys' fees under DCL § 276-a.

    iv.  <u>Korff is Not Entitled to Judgment as an Innocent Creditor under DCL § 278</u>

Korff's fourth argument is that "[b]ecause of the dispositive, uncontradicted evidence that Mr. Korff (a) gave fair consideration in exchange for the [Second Amendment] and (b) lacked any knowledge of any scheme by the Debtor to defraud his creditors, he was absolutely shielded by DCL § 278(1) from any liability for fraudulent conveyance under the DCL." (Def. JNOV Mem. at 19.) DCL § 278 provides:

    1)  Where a conveyance or obligation is fraudulent as to a creditor, such  creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or immediately from such a purchaser,

    a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

    b. Disregard the conveyance and attach or levy execution upon the property conveyed.

2) A purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment.

    This argument fails for much of the same reasons that Korff's previous arguments also fail. First, the evidence provided by Korff supporting his claim of fair consideration for the Second Amendment is neither "dispositive" nor "uncontradicted." Second, without records or bills indicating that Korff provided services to 455 CPW or Columbia in connection with the transaction, a reasonable jury could have concluded that there was no fair consideration for a $300,000 transfer. Further, the jury dispositively found that Korff possessed the actual intent to defraud Palermo's creditors. This finding is supported by Palermo's testimony that Korff had been made aware, at the time of the transfer, that Palermo was unable to pay his creditors (tr. at 332), by entries on Defendant's Exhibit A indicating that many of Palermo's checks to Korff bounced, by the fact that Korff's tax return for 2004 omitted reporting income (whether interest, fee income, or both) from any of the parties to the transaction (Trust. Ex. 74), and by the application of the badges of fraud. Because the jury reasonably found for the Trustee on these issues, Korff is not entitled to judgment as an innocent creditor pursuant to DCL § 278(1).

    Further, as the Trustee points out in its opposition papers, Korff waived any right to assert a defense under DCL § 278 "by failing to preserve it in: 1) his answer; 2) the final pre-trial order; 3) affirmatively dropping the defense [at least with respect to transfers made after July 29,

2004][14]; and 4) his motion pursuant to Fed. R. Civ. P. 50(a) at the close of evidence." (Trustee JNOV Opp. Mem. at 22) (internal citations omitted.) Korff's failure to preserve this defense and to raise this argument in his Rule 50(a) motion precludes him from renewing it here under Rule 50(b), Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 112 (2d Cir. 1996), and provides alternate grounds by which this argument by Defendant should be dismissed.

> v.  The Court's Charge to the Jury was Proper and Korff did not Adequately Preserve any Objections to the Charge

Finally, Korff argues that he is entitled to a new trial because the Court: 1) failed to instruct the jury on partial consideration; 2) failed to instruct the jury on alter ego; and 3) improperly instructed the jury on constructive knowledge. (Def. JNOV Mem. at 22-25.)

As discussed above, for Korff to have prevailed under DCL § 278(1), the jury would have had to have found 1) that Korff provided fair consideration for the transfer and 2) that Korff had no actual or constructive notice of the Debtor's intent to defraud. The jury found for the Trustee on both these issues and concluded that Korff had not provided fair consideration and that he had had the actual intent to defraud. (Tr. 691-693, 710-711.) The jury's finding that Korff acted with the actual intent to defraud Palermo's creditors both precludes the applicability of the DCL § 278(2) set-off and renders this argument moot.

Next, with regards to the alter ego instruction it should be noted that the Court accepted Korff's request that the $300,000 transfer be referred to as the "alleged arrangement" or "alleged transfer" from Palermo to Korff in the jury charge so that Korff could argue that the payment did not come from Palermo. (Id. at 608). In addition, the charge included the following: "First, Mr. Korff contends that his receipt of rights in a fee was from Butterfield Trust I LLC, Columbia or 455 Central Park West LLC, and there was no transfer from Mr. Palermo at all." (Id. at 687.)

---

[14] At trial, the parties stipulated that the jury should not consider any "advances" made by Korff to Palermo postdating July 29, 2004 in connection with the issue of fair consideration for the $300,000 transfer. (Tr. at 514.)

Further, while Korff requested the use of the word "control" in the charge, and while this request was denied, Korff did not explicitly request a formal alter ego instruction beyond that and did not renew his objection at a later time. Thus, while the term "alter ego" was not included in the jury charge, the jury was informed of Korff's defense that he did not receive the fee from Palermo.

Finally, Korff contends that the "Court improperly instructed the jury regarding the requirement for determining [that] Mr. Korff had [the] actual intent to defraud the Debtor's creditors as required by Section 276-a." (Def. JNOV Mem. at 24.) The Defendant cites to Second Circuit precedent for the proposition that a transferee has actual intent to defraud "only if he actively participates in the transferor's scheme to defraud his creditors," Carey v. Crescenzi, 923 F.2d 18, 20 (2d Cir. 1991), and argues that the Court's instruction on § 276 "was insufficient as a definition of actual intent to defraud." (Def. JNOV Mem. at 24.) Specifically, the instruction that Korff, now for the first time objects to, states:

> [T]hird, that Mr. Korff knew or should have known from the facts and circumstances surrounding the transaction that Mr. Palermo had the actual intent in arranging the transaction to hinder or delay, or the intent to defraud[,] his creditors.

(Tr. at 697.)

First, to be clear, this instruction refers exclusively to DCL § 276, which requires only a finding of Palermo's actual intent, as contrasted from DCL §276-a which also requires a finding of Korff's actual intent. The Court did not give an instruction on DCL §276-a, nor was one requested by either of the parties. The Court did, however, specifically instruct the jury that DCL §276 requires "actual intent, as distinguished from intent presumed in law." (Tr. at 695.) Thus the jury had just been informed of the distinction between intent presumed by law and actual intent when it answered the interrogatories required by DCL §276-a about Korff's actual intent. (Id. at 700.)

Second, a jury could have reasonably concluded from the evidence presented that Korff did "actively participate" in Palermo's scheme to defraud his creditors. Korff was aware that Palermo had numerous outstanding judgments from creditors (tr. at 332) and was aware that many of Palermo's checks failed to clear (Def. Ex. A, T), but nonetheless signed the Second Amendment (Trust. Ex. 50) and accepted the $300,000 transfer despite the warning signals in the July 29, 2004 letter agreement on behalf of Columbia and the release demanded by Columbia and 455 CPW. The jury explicitly found that both Palermo and Korff had the actual intent to defraud Palermo's creditors. (Tr. at 710-11.) The Court properly instructed the jury on DCL §276 and the jury made the required findings of actual intent as to both DCL §276 and DCL §276-a.

### c. Conclusion

For all the foregoing reasons, the Defendant's motion for a judgment notwithstanding the verdict, or for a new trial, is denied.

## III. Trustee's Motion for Attorneys' Fees

### a. Legal Standard

New York DCL § 276-a provides, in relevant part:

> In an action or special proceeding brought by … trustee in bankruptcy…to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the … trustee in bankruptcy … shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the … trustee in bankruptcy…in such action or special proceeding, and…trustee in bankruptcy…shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment. The fee so fixed shall be without prejudice to any agreement, express or implied, between the … trustee in bankruptcy…and his attorney with respect to the compensation of such attorney.

The DCL makes clear that in order for a Court to award attorneys' fees against a defendant transferee under Section 276-a, there must be a finding of actual intent to defraud on the part of both the transferor and the transferee. See Carey v. Crescenzi, 923 F.2d 18, 21-22 (2d Cir. 1991). If actual intent to defraud is established, "Section 276-a expressly mandates that the Court shall fix the reasonable attorneys' fees of the creditor [and that] the creditor shall have judgment therefor against the debtor and the transferee." In re Kovler, 249 B.R. 238, 245 (Bankr. S.D.N.Y. 2000).

**b. Discussion**

As of May 16, 2011, the Trustee has incurred $407,187.99 in attorneys' fees and disbursements from the firm Storch Amini & Munves PC ("Storch") in connection with prosecuting this action over the past four years. (Supp. Wright Decl. at ¶ 8.) The time records submitted by the Trustee reflect time spent "conducting discovery before the United States Bankruptcy Court for the Southern District of New York; opposing a motion to withdraw the reference from the court; participating in Court-Ordered mediation; opposing a motion to withdraw filed by Korff's former counsel, preparing for and attending status conferences before Judge Karas; opposing many last minute motions by Defendants and arguing said motions; preparing for and conducting a four day trial before this Court; filing a Notice of Settlement of Proposed Judgment; opposing Korff's post-trial motion for reconsideration, and drafting this motion." (Trustee Fees Mem. at 9.)

Korff objects to the award of attorneys' fees on a number of grounds. Specifically he argues that: 1) the jury's finding of actual fraud is subject to serious doubt; 2) the Trustee may not recover more than the amount of fees owed to his counsel under their court-approved retention agreement; 3) the Trustee is barred from collecting attorneys' fees due to his failure to

plead a claim for these fees in the complaint; and 4) the Trustee disbursements are unsupported. (See Def. Fees Opp. Mem.) The Court will address each of these objections in turn.

### a.   The Jury's Finding of Actual Fraud is Not Subject to Serious Doubt

Korff argues first that the Trustee is not entitled to an award of attorneys' fees because the jury's finding that Korff had actual intent to defraud is subject to serious doubt. As discussed in the first half of this opinion, the jury's finding that Korff had actual intent to defraud Palermo's creditors is a reasonable one given his testimony, his demeanor on the witness stand (see e.g., tr. at 408, 410-18, 420-21, 492), and other evidence presented at trial. As such, this argument fails.

### b.   The Trustee May Recover More than the Amount of Fees Owed to Counsel under the Retention Agreement

Next, Korff argues that the Trustee's motion should be denied because it cannot recover more than the amount of fees owed to his counsel under their court-approved retention agreement. (Def. Fees Opp. Mem. at 4.) Korff states, "no case law supports a fee award exceeding the Plaintiff's contractual fee obligation." (Id. at 5.) That assertion is false. Rather, the Supreme Court held in Blanchard v. Bergeron, 489 U.S. 87, 93 (1989) that where a statute broadly requires that defendants pay a prevailing plaintiff a reasonable fee, "a contingent fee contract *does not impose an automatic ceiling* on an award of attorney's fees." (emphasis added). In concluding that the contingency fee agreement in Blanchard did not operate as a ceiling to the recovery of attorneys' fees, the Supreme Court found that the civil rights statute at issue did not require that the attorneys' fee be limited by the terms of the plaintiff's existing fee agreement with counsel (id.), and overruled Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714 (1974), upon which Korff relies. Since Blanchard, the Second Circuit and courts outside this circuit have awarded reasonable statutory attorneys' fees beyond the amount that would be recovered under a

contingency agreement. See e.g., Reiter v. MTA N.Y.C. Transit Auth., 457 F.3d 224, 232-33 (2d Cir. 2006); Getty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 114 (2d Cir. 1988); Crescent Publ'g Group, Inc. v. Playboy Enters., Inc., 246 F.3d 142, 151 (2d Cir. 2001); Delman Fabrics Inc. v. Holland Fabrics Inc., 1986 WL 13803 at *1 (S.D.N.Y. Nov. 28, 1986). There is nothing within DCL § 276-a which requires that attorneys' fees be limited by the terms of the contingency fee agreement—the statute only requires that the fees set by the judge be "reasonable."

Further, the Second Circuit has upheld an award of reasonable attorneys' fees in a Lanham Act case, which, like DCL §276-a states that the "court…may award reasonable attorney fees to the prevailing party," because the defendant acted "willfully." Getty Petroleum Corp. v. Bartco Petroleum Corp., 858 F.2d 103, 114 (2d Cir. 1988). In Getty, the Court awarded reasonable attorneys' fees with no limit to the hourly rate Getty was actually charged under its special billing arrangement with counsel. Id. In the instant case, the jury found, by clear and convincing evidence, that Korff acted with "actual intent." "Willfulness" and "actual intent" amount to the same degree of intent.[15]

Finally, DCL § 276-a states that "[t]he fee so fixed shall be without prejudice to any agreement express or implied between…the trustee in bankruptcy…and his attorney with respect to the compensation of such attorney." Korff cites to this language to support his argument that the Plaintiff should not be entitled to an award greater than that which he is obligated to pay under the preexisting fee agreement. (Def. Fees. Opp. Mem. at 5.) However, when the reasonable fee is fixed under §276-a by the Court at a higher amount than the amount of the contingency fee

---

[15] In fact, in interpreting the term "willfulness" as applied to sections of the Bankruptcy Code, courts in this Circuit have held that "[t]he concept of willfulness requires not merely an intent to commit the wrongful act but an actual intent to inflict the resulting injury upon the affected creditor." In re Taneff, 190 B.R. 501, 506 (W.D.N.Y. 1996) (internal citation omitted).

agreement, the contingency fee agreement has not been prejudiced. Prejudice to the contingency

fee agreement would only occur if the contingency fee were more than the reasonable fee fixed

by the Court. Further, although the contingency fee is not requested by the Trustee, at least one

court in this Circuit has read DCL §276-a to permit an award of reasonable attorneys' fees in

addition to any award to Plaintiff's counsel pursuant to the preexisting contingency fee. In re

Montclair Homes v. Larosa, 200 B.R. 84, 98 (Bankr. E.D.N.Y. 1996) (finding that an award of

reasonable attorneys' fees was appropriate and that "nothing… shall be construed to affect the

[earlier] Order of this Court…which entitles plaintiff's counsel to a contingency fee of one-third

of the amount recovered for the benefit of the estate.").

Accordingly, for all these reasons, this Court is of the opinion that the Trustee is entitled

to an award of reasonable attorneys' fees in this case.

     c.   The Trustee is Not Barred from Collecting Attorneys' Fees due to his Failure to
Plead the DCL § 276-a Claim in the Complaint because that Failure did not
Prejudice the Defense

Korff's third argument is that the Trustee is not entitled to claim any attorneys' fees,

because it "failed to plead in his Complaint any claim under Section 276-a or, indeed, any claim

for attorneys fees at all." (Def. Fees Opp. Mem. at 6.) Korff argues that Plaintiff's request "at the

end of trial to amend his complaint after he had already closed his case…came far too late" such

that the Plaintiff should now be precluded from seeking fees. (Id.) As the Trustee notes, while

"Korff claims that the Second Circuit has adopted the rule that attorneys fees are 'special

damages' under Fed. R.Civ. P. 9(g) that must be pled in the complaint, he is wrong." (Trustee

Fees Reply Mem. at 2); see Klarman v. Santini, 503 F.2d 29, 36 (2d Cir. 1974) (The "failure to

specifically request attorney's fees…does not in itself prevent recovery."). Moreover, even

courts that have held that attorneys' fees are special damages have permitted recovery under

Rule 54(c) regardless of whether such damages are pled, so long as no prejudice was suffered.

See In re Rivastigmine Patent Litig., 2007 WL 1154000 at *8 (S.D.N.Y. Apr. 19, 2007)

(collecting cases). Even if not pled in the complaint, a party may, if grounds exist, demand

attorneys' fees after trial on a Rule 54 motion. Id.

Here, as the Trustee notes, Korff suffered no prejudice because: "(i) he was on notice [by

the joint pre-trial order dated October 7, 2010] of the Trustee's intent to seek attorneys' fees

under New York DCL 276-a … (Tucker Fees Decl. at Ex. 2); (ii) the complaint was amended [to

include DCL § 276-a claims] pre-judgment[16]…;(iii) he planned his trial strategy all along on the

assumption, albeit an incorrect one, that the Trustee would have to prove actual fraud on the part

of the *transferee* in order to succeed on the New York DCL §276 claim that was pled in the

Trustee's complaint[17]; and (iv) the issue of whether he received the transfer with actual intent to

defraud the Debtor's creditors was submitted to the jury." (Trustee Fees Reply Mem. at 3.)

Because the Trustee, at the close of evidence, properly moved to amend the original complaint to

---

[16] On October 27, 2010, following the denial of Korff's motion for a directed verdict, Plaintiff moved the Court for an order amending the complaint pursuant to Fed. R. Civ. P. 15 to add a claim for attorneys' fees pursuant to DCL § 276-a. The Court heard oral argument and reserved its decision. On October 28, 2010, the Court granted Plaintiff's motion and submitted to the jury the issue of whether Korff had the actual intent to defraud the Debtor's creditors. (Tr. at 700.) Any motion to reconsider the Court's ruling on this motion to amend the complaint had to be made no later than November 12, 2010. Thus, Korff's February 18, 2011 application to have this decision reconsidered is also time-barred.

[17] On October 22, 2010, Schiff Hardin resubmitted Defendant's Requests to Charge and included the following: "To prevail on his claim under Debtor and Creditor law Section 276, Plaintiff must prove by clear and convincing evidence that *both* Mr. Palermo and Mr. Korff engaged in the transfer with actual intent to hinder, delay, or defraud Mr. Palermo's creditors." (Tucker Fees Decl. at Ex. 5) (emphasis added). Prior to the start of the third day of trial, Korff submitted an Amended Request to Charge containing the same language on New York § 276. (Id. at Ex. 6.) During the charging conference, Korff maintained that actual intent on the part of Korff, as transferee, and the Debtor, as transferor, was required under DCL § 276. (Tr. at 203-06, 570, 594, 601). This record indicates, as the Trustee argues in its papers, that Korff's trial strategy "focused on showing that he lacked the actual intent to defraud the Debtor's creditors. [This] defense, even if wrong as a matter of law [with respect to DCL § 276] was an integral part of [Korff's] defense to the Trustee's claim under DCL §276." (Trustee Fees Reply Mem. at 3, n.5.) As such, the inclusion of a claim for attorney's fees under DCL § 276-a, which does require a finding of actual intent on the part of the transferee, cannot be seen as prejudicial against the Defendant. Korff expected all along, albeit incorrectly, that he would have to show that he lacked the actual intent to defraud Palermo's creditors. Whether he would have to show this as a defense under DCL §276 or DCL §276-a is immaterial and there was no prejudice. Furthermore, Korff did not object to the charge as given on either DCL §276 or DCL § 276-a or to the verdict sheet given to the jury. (Tr. at 703.)

claim attorneys' fees and because the Defendant had received sufficient notice of that claim, Defendant's claim that the Trustee's failure to plead attorneys' fees in the complaint is insufficient to deny Trustee's claim for fees.

        d.   <u>Trustee's Fees and Disbursements are Supported</u>

Finally, Korff claims that the Trustee's proposed award of $407,187.99, including fees and disbursements, is unsupported and inflated. (Def. Fees Opp. Mem. at 7.) Rather, as the discussion below indicates, the Trustee's legal fees and disbursements are reasonable and should be awarded in full.

After determining that a party is entitled to recover attorneys' fees under DCL § 276-a, a court must then "fix the reasonable attorneys' fees" for litigating that action. In <u>Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany</u>, 522 F.3d 182, 190 (2d Cir. 2008), the Second Circuit shifted away from the use of the "lodestar" method in calculating reasonable attorneys' fees and toward a method of reviewing "all of the case-specific variables that [the Second Circuit] and other courts have identified as relevant to the reasonableness of attorneys' fees in setting a reasonable hourly rate" to determine the "presumptively reasonable fee." Courts following <u>Arbor Hill</u> utilize a four step process to determine whether or not a fee is presumptively reasonable: 1) determine the reasonable hourly rate; 2) determine the number of hours reasonably expended; 3) multiply the two to calculate the presumptively reasonable fee; and 4) make any appropriate adjustments to arrive at the final fee award. <u>Building Serv. 32BJ Health Fund v. Renaissance Equity Holdings, LLC</u>, 2010 WL 1438117 at *2 (S.D.N.Y. April 9, 2010).

*Determine the reasonable hourly rate*

To determine the reasonable hourly rate, courts should look at the rate a "paying client would be willing to pay" and what is known as the "Johnson factors." Id. at 189-90; see also Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974).[18] The rates outlined in the accompanying Wright Declaration—ranging from $110/hour for paralegals to $525/hour for Officers of the Firm—are reasonable and in line with the rates charged by firms in New York City of comparable size and reputation. (Wright Fees Decl. at ¶¶ 5-10.) The qualifications and experience of the attorneys and paralegals on this case, as described in the Wright Declaration, and each of which have been reviewed by the Court, also support the finding that Storch's hourly rates are reasonable.

*Determine the number of hours reasonably expended*

The hours expended by the Storch firm were also reasonable given the amount of work required to conduct discovery and prepare for trial. Furthermore, following the last minute appearance of Schiff Hardin after the pre-trial order date and a week before trial was scheduled to begin, the Defendant "filed almost daily letter briefs, produced additional discovery including depositions, altered its defense, attempted to revise the pre-trial stipulation and submitted revised jury charges and proposed voir dire." (Trustee Fees Mem. at 12-13.) Storch provided contemporaneous records detailing, by tenths of an hour, the work performed by each attorney and/or paralegal and such records support a finding that a reasonable number of hours were expended on this case. Since it was the delaying and untimely conduct of Defendant and his

---

[18] The "Johnson factors" are: "1) the time and labor required; 2) the novelty and difficulty of the questions; 3) the level of skill required to perform the legal service properly; 4) the preclusion of employment by the attorney due to acceptance of the case; 5) the attorney's customary hourly rate; 6) whether the fee is fixed or contingent; 7) the time limitations imposed by the client or the circumstance; 8) the amount involved n the case and the results obtained; 9) the experience, reputation, and ability of the attorneys; 10) the "undesirability" of the case; 11) the nature and length of the professional relationship; and 12) awards in similar case." Johnson, 488 F.2d. at 717-19.

counsel that caused these expenditures of legal services, it is only equitable that the Defendant

should bear the cost.

*Multiply the Two to Calculate the Presumptively Reasonable Fee*

The "presumptively reasonable fee" is calculated by multiplying the "reasonable hourly

rate" and the "number of hours reasonably expended." Building Serv. 32BJ Health Fund v.

Renaissance Equity Holdings, LLC, 2010 WL 1438117 at *2 (S.D.N.Y. April 9, 2010). Based on

the foregoing, the Trustees fee of $341,290 is presumptively reasonable.

Korff objects to this amount on the ground that the Trustee's fees are "inflated," (Def.

Fees Opp. Mem. at 7) but cites to no specific errors in the billing calculations or specific

instances where he believes that the numbers are inflated. Nor could the Court find any evidence

of duplication of hours on review of the submission. Further Korff does not explain why the fee

is "excessive on its face" or why a "deduction of at least $100,000 to Plaintiff's claimed fees is

appropriate." (Id. at 8, 9.) These general statements, without more articulation, are insufficient to

rebut the presumption of reasonability of the Trustee's fee. Where, as in this instance, it is the

Defendant's conduct in the litigation that led to the expenditure of plaintiff's legal services,[19] it's

only right that the Defendant bear those costs,[20] especially when the jury has found, by clear and

---

[19] On October 5, 2010, less than three weeks prior to the start of trial, the Defendant sent his proposed exhibit list with exhibits to the Trustee. (Declaration of Bonnie A. Tucker, Esq. dated October 7, 2010 ("Tucker Produc. Decl.") at ¶ 2.) The Defendant's exhibits included documents that were not produced during the course of discovery. (Id. at ¶ 3.) On October 7, 2010, the Trustee moved this Court for an order precluding Defendant from entering any documentary evidence at trial that was not produced during discovery. On October 8, 2010, the Court indicated that it intended to grant the Trustee's motion unless the Defendant submitted to a deposition by Trustee on or before October 15, 2010. The Defendant was deposed during this period. Further, at trial, Korff took the position that the $300,000 transfer was made for consideration given to the Debtor in the form of loans and advances. (Tr. at 552.) He had not, however, provided the underlying documents—books and ledgers kept in the ordinary course of business relevant to the purported loans and advances—in advance of trial. On October 25, 2010, the first day of trial, the Court ordered such production. (Tr. at 18-21.)

[20] In fact, of the $341,290 that the Plaintiff seeks in fees, approximately $142,000 of those fees were incurred following the close of trial on October 28, 2010—primarily due to the Defendant's November 4, 2010 post-trial motion for reconsideration and attorneys' fees and the instant motion for judgment as a matter of law, or for a new trial. Further, approximately $68,000 in fees is attributable to the six-day period between the time Oberdier filed his

convincing evidence, that the Defendant had the actual intent to hinder, delay, or defraud the Debtor's creditors.

### Make Appropriate Adjustments

Here, the Trustee has already eliminated over 70 hours of attorney and paralegal time—totaling $23,381.50—from the fees sought in this application. (Wright Decl. at ¶¶ 8, 9.) No further adjustments are necessary.

Korff also argues that the Trustee's claim for "disbursements" totaling "$65.897.99 is "wildly-inflated and unsupported." (Def. Fees Opp. Mem. at 7.) Specifically, Korff objects to the fact that this amount includes approximately $33,000 in accountant consultant fees and $29,000 for staff expenses including meals and overtime charges "which…is inappropriate to pass onto…Korff." (Id.) The accountant consultant fees were incurred to review the very voluminous 2004 tax returns of the Defendant and of Arc Development LLC and to review Korff's business records which were provided during the trial and which required the accountant's presence throughout the trial. Under these circumstances, the Court is unable to find that this fee is unreasonable. The last minute staff expenses, just preceding and during trial, were similarly incurred as a result of the late production of Korff's tax returns and his accounting books, as well as those of one of his entities, Arc Development LLC.

While New York DCL § 276-a does not expressly provide for an award of disbursements, they are regularly granted in this Court, to which the Defendant removed this action. As such, the Trustee's claim for disbursements is also granted.

---

notice of appearance and the first day of trial. During this time the Korff's new counsel made multiple *in limine* motions requiring response by the Trustee. (Trustee Fees Mem. at 6.)

### c.  Conclusion

For the foregoing reasons, the Trustee's motion pursuant to NY DCL § 276-a for attorneys' fees and disbursements in the amount of $407,187.99, is granted.

## IV. Conclusion

For the foregoing reasons, the Defendant's motion for a judgment as a matter of law, or for a new trial, is denied, and the Trustee's motion for attorneys' fees is granted. The Clerk of the Court is directed to enter judgment for the Trustee in the amount of $407,187.99 for attorneys' fees and disbursements. The Trustee's Bill of Costs, dated February 22, 2011, should be presented to the Clerk of the Court for its consideration for inclusion in the judgment.


SO ORDERED


Dated: New York, New York

September 2, 2011

Robert P. Patterson, Jr.

U.S.D.J.

44

**Copies of this Order have been sent to:**

*Counsel for Plaintiff:*
**Lita Beth Wright**
Storch, Amimi & Munves, P.C.,
2 Grand Central Tower, 25th Floor
New York, NY 10017
(212) 490-4100
Fax: (212) 490-4208

**Bonnie Alison Tucker**
Storch Amini & Munves, P.C.
2 Grand Central Tower,
140 East 45th Street
25th Flr.
New York, NY 10017
(212) 490-4100

*Counsel for Defendant:*
**Carl W. Oberdier**
Schiff Hardin LLP
900 Third Avenue
New York, NY 10022
(212)753-5000
Fax: (212)753-5044